# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | |
|---|---|
| **PATRICK W. WILLIAMS** | **CIVIL ACTION NO. 05-1225** |
| **VS.** | **SECTION P** |
| **BURL CAIN, WARDEN** | **JUDGE MELANCON** |
| | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

Before the court is the petition and amended petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. §2254 by *pro se* petitioner Patrick W. Williams on July 8, 2005. Williams is an inmate in the custody of Louisiana's Department of Public Safety and Corrections. He is incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Williams is serving sentences imposed following his January 12, 2001 convictions for aggravated burglary and second degree kidnaping entered in the 16th Judicial District Court for Iberia Parish.

This matter has been referred to the undersigned in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court.

## STATEMENT OF THE CASE

On January 12, 2001, petitioner was convicted of aggravated burglary and second degree kidnaping following trial by jury in the 16th Judicial District Court. On January 19, 2001, Williams was sentenced to concurrent thirty year sentences. However, on January

31, 2001, petitioner was adjudicated a multiple offender. Accordingly, his thirty year second degree kidnaping sentence was vacated and petitioner was re-sentenced to serve forty-five years, that sentence to run concurrent with petitioner's thirty year sentence imposed for his aggravated burglary conviction.

On February 6, 2002, petitioner's convictions and sentences were affirmed by the Third Circuit Court of Appeals. *State v. Williams*, 2001-0998 (La. App. 3d Cir. 2/6/2002), 815 So.2d 908. On January 31, 2003, the Supreme Court denied writs without comment. *State v. Williams*, 2002-0578 (La. 1/31/2003), 836 So.2d 59. Petitioner apparently did not seek further direct review in the United States Supreme Court. On direct appeal, Williams argued three assignments of error: (1) that there was insufficient evidence to support his convictions; (2) that trial court erred by imposing his sentences immediately after the denial of his Motion for New Trial, contrary to the provisions of La.C.Cr.P. art. 873; and (3) that his sentences were excessive.[1] [tr. pg. 781-782].

On November 21, 2003, Williams filed an Application for Post-Conviction Relief in the Sixteenth Judicial District Court. In post-conviction proceedings, Williams argued the following five claims for relief: (1) that the trial court erred "in relying extensively on medical testimony regarding [the] accused's competency" to stand trial; (2) that his right to speedy trial was violated; (3) the trial court and prosecutor misquoted the law of battery during *voir dire* and opening statement in violation of his rights to due process and a fair

---

[1]With respect to his excessive sentence claim, the Third Circuit found that it could not review petitioner's forty-five year second degree kidnaping sentence because petitioner failed to move for reconsideration of that sentence in the trial court at the habitual offender hearing as required by L.C.Cr.P. art. 881.1. Accordingly, the appellate court reviewed only petitioner's thirty year sentence for aggravated burglary.

trial; (4) that he received ineffective assistance of counsel at trial; and (5) that there was insufficient evidence to support his habitual offender adjudication. This application was denied by the trial court on February 10, 2004 with written reasons assigned on March 1, 2004. [tr. pp. 866 and 916-917].

In denying the application, the trial court adopted as its own, the reasoning set out by the District Attorney in his Answer to the application as to Claims 2-5, and provided additional reasons in support of its denial of Claim 1. With respect to petitioner's competency claim (claim 1), the court found that the claim was barred as a result of petitioner's failure to raise the claim on direct appeal as required by L.C.Cr.P. art. 930.4. The trial judge additionally found that petitioner was not erroneously found competent to stand trial as a result of an alleged "mental defect" (a personality disorder) or prior abuse. That finding was based on the fact that all of the doctors found petitioner competent, despite noting the possibility of a personality disorder, citing his unwillingness to cooperate and appearance as a malingerer who was attempting to fake mental illness to avoid the consequences of his crime, as justification for their findings. The trial judge also found that the doctors' assessment was consistent with his own assessment of petitioner's courtroom behavior, namely, that of a malingerer. [tr. pg. 916-917]. With respect to petitioner's speedy trial claim (claim 2), the court found the claim barred as a result of petitioner's failure to raise the claim on direct appeal as required by L.C.Cr.P. art. 930.4. Additionally, the court found that the delays were caused by the defense, both

from the defendant's refusal to cooperate with his attorney, and from defense motions. [tr. pgs. 860-862]. With respect to the alleged misquotation of the law of battery (claim 3), the court found that the claim was not a ground for post-conviction relief as set forth in L.C.Cr.P. art. 930.3 and was further barred as a result of petitioner's failure to contemporaneously object as required by L.C.Cr.P. art. 801. Moreover, the court noted that any error was harmless as the defense admitted that an aggravated burglary had been committed, but contested only that petitioner was the person who committed the crime. [tr. pgs. 862-863]. With respect to petitioner's ineffective assistance of counsel claims (claim 4), the court found that petitioner had failed to demonstrate what information would have been discovered on further pre-trial investigation or how that information would have changed the outcome of his trial. Moreover, the defendant failed to demonstrate that his attorney's representation was improper, or that any different representation would have changed the outcome of his trial, considering the overwhelming evidence of guilt, the unanimous jury verdict and the difficulty and lack of cooperation various defense counsel encountered in attempting to represent petitioner. [tr. pg. 863-864]. With respect to petitioner's habitual offender proceeding (claim 5), the court found that the claim had been fully litigated on appeal and was therefore barred pursuant to L.C.Cr.P. art. 930.4(A), and further that the State had presented sufficient and competent evidence of petitioner's prior conviction. [tr. pg. 864-865].

On July 8, 2004, petitioner's writ application was denied by the Louisiana Third

Circuit Court of Appeal. That court found as follows:

> First, the trial court did not abuse its discretion when finding Relator competent to proceed to trial and aid in his defense. Additionally, Relator failed to present proof that he suffered a stroke or that he was diagnosed with schizophrenia and that those conditions affected his competency.
>
> Second, Relator's right to a speedy trial was not violated. All claims Relator had regarding La.Code Crim.P. art. 701 and ... 578 became moot when he was convicted. [citations omitted]. Furthermore, substantial delays in this matter were caused by defense counsel filing a motion to have Relator evaluated by a sanity commission, a motion to have Relator re-evaluated, a motion to withdraw as counsel of record. Considering all the circumstances in this case, Relator's constitutional right to a speedy trial was not violated.
>
> Third, Relator's assignment regarding battery is without merit. See *State v. Robertson,* 20 So. 296 (La. 1896); *State v. Foster*, 101 So. 255 (La. 1924); *State v. Dauzat*, 392 So.2d 393 (La. 1980); *State v. Robinson*, 549 So.2d 1282 (La.App. 3rd Cir. 1989); *State v. Mitchell*, 466 So.2d 514 (La. App. 3rd Cir.), *writ denied*, 467 So.2d 1121 (La. 1985); *State v. Lachney*, 621 So.2d 846 (La. App. 5th Cir. 1993).
>
> Fourth, Relator did not provide sufficient proof of his ineffective assistance of counsel claims. Relator did not allege that defense counsel totally failed to subject the State's case to meaningful adversarial testing. Therefore, the presumption of prejudice set out in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984) does not apply to this case. Additionally, Relator failed to meet the burden of proof set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).
>
> Finally, Relator may not attack his habitual offender proceeding in an application for post conviction relief. *State ex. rel. Melinie v. State*, 93-1380 (La. 1/12/96), 665 So.2d 1172; *State v. Brown*, 03-2568 (La. 3/26/04), 870 So.2d 976. Additionally, Relator failed to prove he first presented his claims that trial counsel was ineffective at the habitual offender hearing and that appellate counsel was ineffective for failing to raise claims regarding the habitual offender proceeding on appeal to the trial court. Pursuant to Uniform Rules – Courts of Appeal, Rule 1-3, those issues were not considered by this court. [tr. pg. 1022-1023].

Petitioner's request for review was denied by the Louisiana Supreme Court on May 20, 2005 without comment. *State ex rel. Patrick W. Williams v. State of Louisiana*, 2004-2089 (La. 5/20/2005), 902 So.2d 1038 (La. 5/20/2005).

Petitioner's *habeas corpus* petition was signed by petitioner on July 5, 2005 and was received and filed in this court on July 8, 2005. In the instant petition for federal *habeas corpus* relief, petitioner argues the following claims for relief: (1) that there was insufficient evidence to support his convictions; (2) that his sentences were excessive; (3) that the trial court erred in relying extensively on medical testimony regarding [the] accused's competency to stand trial; (4) that his right to speedy trial was violated; (5) the trial court and prosecutor misquoted the law of battery during *voir dire* and opening statement in violation of his rights to due process and a fair trial; (6) that he received ineffective assistance of counsel at trial; and (7) that there was insufficient evidence to support his habitual offender status.

The State has filed an answer and submitted the state court record for this court's review. [docs. 13, 19 and 20]. Petitioner has filed a Reply. [doc. 14]. This report and recommendation follows.

After a full review of the record, the undersigned finds that the grounds asserted for relief are without merit. Accordingly, for the following reasons, it is recommended that the petition be **DENIED AND DISMISSED WITH PREJUDICE.**

### *Standard of Review*

This *habeas* petition was filed on July 8, 2005; therefore the standard of review is set forth in 28 U.S.C. §2254(d), as amended in 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA). *Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir. 2000); *Orman v. Cain,* 228 F.3d 616, 619 (5th Cir. 2000).[2] AEDPA substantially restricts the scope of federal review of state criminal court proceedings in the interests of federalism, comity, and finality of judgments. *Montoya v. Johnson*, 226 F.3d 399, 403-04 (5th Cir. 2000) citing *Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000)[3] (noting that AEDPA "placed a new restriction on the power of federal courts to grant writs of *habeas corpus* to state prisoners").

Title 28 U.S.C. §2254(d) as amended, states as follows:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[2]Before enactment of AEDPA, "a federal court entertaining a state prisoner's application for *habeas* relief ...exercise[d] its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (i.e., application of constitutional law to fact). In other words, a federal *habeas* court owed no deference to a state court's resolution of such questions of law or mixed questions." *Montoya ,* 226 F.3d at 403-04 citing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000) and 28 U.S.C. S 2254(d) (West 1994).

[3]Justice O'Connor delivered the opinion of the Court with respect to the standard of review, while Justice Stevens delivered the opinion of the court with respect to other aspects of the opinion which have no bearing on the issues herein. Accordingly, the undersigned will refer to Justice Steven's opinion as a concurring opinion.

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the deferential scheme of §2254(d), as amended, this court must give deference to a state court decision for "any claim that was adjudicated on the merits in State court proceedings" unless the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2).

A *habeas* petitioner has the burden under AEDPA to prove that he is entitled to relief. *Ormon*, 228 F.3d at 619 citing *Williams,* 120 S.Ct. at 1518, and *Engle v. Isaac*, 456 U.S. 107, 134-35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Under §2254(d), as amended, "[t]he federal courts no longer have a roving commission to discern and "correct" error in state court proceedings, but must exercise a more limited review . . ." *Grandison v. Corcoran*, 78 F.Supp.2d 499, 502 (D. Md. 2000). Federal courts may not grant the writ merely on a finding of error by a state court or on a finding of mere disagreement with the state court. *Montoya,* 226 F.3d at 404; *Orman,* 228 F.3d at 619.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on a question of law or if the state court decides a case differently than ... [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) citing *Williams,* 120 S.Ct. at 1523; *Montoya,* 226 F.3d at 403-04 citing *Williams*, 120 S.Ct. at 1523. "The 'contrary to' requirement 'refers to holdings, as opposed to the dicta, of ... [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Dowthitt ,* 230 F.3d at 740 citing *Williams*, 120 S.Ct. at 1523.

Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt,* 230 F.3d at 741 citing *Williams,* 120 S.Ct. at 1523. The standard is one of objective reasonableness. *Montoya,* 226 F.3d at 404 citing *Williams,* 120 S.Ct. at 1521-22. A federal *habeas* court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly ... [r]ather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Section 2254(d)(2) speaks to factual determinations made by the state courts. *Dowthitt,* 230 F.3d at 741. Federal *habeas* courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing

evidence. *Id.* Thus, this court must defer to the state court's decision unless it was based on an unreasonable determination of the facts in light of the record of the State court proceeding. *Id.* citing 28 U.S.C. §2254(d)(2); *Knox,* 224 F.3d at 476 citing *Chambers v. Johnson,* 218 F.3d 360, 363 (5th Cir.2000).

### *Timeliness of the Petition*

Title 28 U.S.C. §2244(d)(1)(A) was amended by AEDPA to provide a one-year statute of limitations for the filing of applications for writ of *habeas corpus* by persons in custody pursuant to the judgment of a State court. This limitation period generally runs from "... the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review ...." 28 U.S.C. §2244(d)(1)(A). A state court judgment is not final for *habeas* purposes until the 90 day period for filing a *writ of certiorari* to the United States Supreme Court has run. *Ott v. Johnson,* 192 F.3d 510 (5th Cir. 1999); *See also Clay v. United States*, 123 S.Ct. 1072, 1077 at fn. 3 (2003); Supreme Court Rule 13. Thus, petitioner's judgment of conviction and sentence became final for AEDPA purposes ninety days after the Louisiana Supreme Court rejected his writ application on direct review, on May 1, 2003.

The statutory tolling provision set forth in 28 U.S.C. §2244(d)(2) provides that the time during which a properly filed application for post-conviction relief was pending in state court is not counted toward the limitation period. *Ott v. Johnson,* 192 F.3d 510, 512 (5th Cir. 1999); *Fields v. Johnson,* 159 F.3d 914, 916 (5th Cir. 1998); 28 U.S.C. §2244(d)(2).

The State argues that the instant petition is untimely because petitioner's November 21, 2003 Application for Post-Conviction Relief was not signed by petitioner, and therefore cannot be considered "properly filed" for purposes of the federal statutory tolling provision. Rather, the State argues that statutory tolling did not begin until petitioner filed a signed Application on February 12, 2004.

This argument is unpersuasive. Although petitioner's November 21, 2003 Application was unsigned, the state court nevertheless filed the Application and treated the Application as both "properly filed" and "pending."[4] Moreover, in its March 1, 2004 Ruling on the Application, the court made no mention of the State's argument regarding petitioner's failure to sign his original application, instead adopting the State's specific arguments addressing claims 2-5 and assigning reasons of its own with respect to petitioner's first claim for relief. Thus, under these circumstances, the undersigned finds that tolling began on November 21, 2003, not February 12, 2004; the one-year limitation period was statutorily tolled from the filing of the unsigned November 21, 2003 Application.

---

[4]On December 8, 2003, the court ordered the State to file an answer. [tr. pg. 859]. Thereafter, on February 2, 2004, the State answered, asserting lack of signature as a procedural defense, as well as asserting other procedural defenses and arguments on the merits. [tr. pg. 860-866]. In response, petitioner filed a duplicate signed Application. [tr. pg. 868-913]. However, prior to this filing, on February 10, 2004, the court denied the original Application for Reasons which would be drafted by the court within thirty days. [tr. pg. 866]. Thereafter, on March 1, 2004, the court issued its Reasons for Ruling making no mention of the State's argument regarding petitioner's failure to sign his original application. [tr. pg. 916-917]. Accordingly, it is clear that the state court found the original application to have been "properly filed".

Moreover, even if tolling did not begin until the signed Application was filed on February 12, 2004, which does not comport with the State court's treatment of petitioner's claims, the instant petition is nevertheless timely filed. From May 1, 2003, when petitioner's conviction became final, until the filing of the signed post-conviction application, 287 days of the one year limitation period ran. The period was tolled through May 20, 2005, the date the Louisiana Supreme Court denied petitioner's request for writs. From that date until the filing of the instant petition on July 8, 2005, another 68 days ran. Thus, on the date the instant petition was filed, only 355 days of the 365 day one-year limitation period had run. The instant petition was timely filed.[5]

### *Procedural Default*

The State also argues that petitioner's Eighth Amendment excessive sentence claim is unexhausted, and hence, technically procedurally defaulted, and that his competency, speedy trial, misquotation of the law of battery and habitual offender proceeding claims are traditionally procedurally defaulted.

The procedural default doctrine applies to bar federal *habeas corpus* review where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, ("traditional" procedural default), or (2) the petitioner fails to exhaust all

---

[5]The undersigned notes that the petition was signed by petitioner on July 5, 2005. Thus, under the "mailbox rule," the petition may be deemed to have been filed not on July 8, 2005, but rather three days earlier on July 5, 2005. See *Houston v. Lack*, 487 U.S. 266, 270, 108 S.Ct. 2379, 2382, 101 L.Ed.2d 245 (1988); *Spotville v. Cain*, 149 F.3d 374, 376 (5th Cir.1998). However, as set forth above, the petition is timely without resort to the "mail box" rule.

available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal *habeas* claim. *Bledsue v. Johnson,* 188 F.3d 250, 254-55 (5th Cir. 1999) citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546 (1986) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728 (1999).

With respect to traditional procedural default, if the last reasoned state court decision on a claim looks to its merits, then the federal courts should also review the claim on its merits. On the other hand, if the last reasoned state court decision on the claim clearly and expressly states that its judgment rests on a state procedural bar, federal *habeas* review is barred. *Harris v. Reed,* 489 U.S. 255, 261, 109 S.Ct. 1038, 1042, 103 L.Ed.2d 308 (1989); *See also Sones v. Hargett,* 61 F.3d 410, 416 (5th Cir. 1996).

The state argues that because the state trial court relied on state procedural rules to deny review of petitioner's competency, speedy trial and misquotation of the law of battery claims, those claims are traditionally procedurally defaulted. However, the last reasoned state court decision on these claims, the March 25, 2004 decision of the Louisiana Third Circuit Court of Appeal, did **not** rely on any procedural bar when reviewing those claims, but rather rejected petitioner's claims on the merits. Accordingly, this court cannot find that the procedural default doctrine bars federal review of petitioner's competency, speedy trial and misquotation of the law of battery claims.

The state additionally argues that petitioner's habitual offender proceeding claim is traditionally procedurally defaulted. It is clear that both the trial court and the Louisiana Third Circuit court of Appeal relied on state procedural rules in denying review of this claim, the trial court citing L.C.Cr.P. art. 930.4 (A) and the appellate court citing the procedural rule announced in *State ex. rel. Melinie v. State*, 665 So.2d 1172 (La. 1/12/96), and re-affirmed in *State v. Brown*, 870 So.2d 976 (La. 3/26/04). Accordingly, the State's argument regarding procedural default will be addressed in the discussion of that claim below.

_____The State also argues that petitioner's Eighth Amendment excessive sentence claim is unexhausted, and hence, technically procedurally defaulted. Review of petitioner's filing in the Louisiana Supreme Court reveals that petitioner did not raise his excessive sentence claim under the Eighth Amendment to the United States Constitution. Rather, petitioner expressly raised his claim under Article I, § 20 of the Louisiana Constitution on 1974 and L.C.Cr.P. art 894.1. *See* rec. doc. 1, Ex. 1, pg. 2 and 7-8. Accordingly, the State's argument will be addressed in the discussion of that claim below.[6]

---

[6]To the extent that the State argues that the entire petition should be dismissed without prejudice as a "mixed" petition, that argument is unavailing. The "mixed" petition rule does not apply when state procedural rules would prevent the petitioner from subsequently raising his unexhausted claims in state court. Rather, in such cases, federal courts should examine those claims which remain unexhausted under the procedural default doctrine, and consider the remaining exhausted claims on the merits. *See Panetti v. Cockrell*, 73 Fed.Appx. 78, 2003 WL 21756365, *2-3 (5th Cir. 2003) (citations omitted). As is discussed below in further detail, petitioner's unexhausted Eighth Amendment claim cannot now be raised in state court. *See* L.C.Cr.P. art. 930.8. Accordingly, this court will not recommend dismissal of this entire petition without prejudice as a "mixed" petition, but rather, will examine petitioner's unexhausted claim under the procedural default doctrine.

# LAW AND ANALYSIS

## I. Sufficiency of the Evidence

Petitioner argues that there was insufficient evidence to support his convictions because there was insufficient evidence demonstrating that he was the perpetrator of the crimes. More specifically, Williams alleges that the victim was unable to identify petitioner as her assailant, that his convictions were based on circumstantial evidence derived from the "suspect" testimony of "two admitted drug users", and the only direct evidence placing him in the victim's home was expert shoe print evidence, which Williams claims was controverted.

A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). When a defendant seeking federal *habeas* relief contends that the evidence is insufficient to support a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991), quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. The court applies this standard with explicit reference to the substantive elements of the criminal offense as defined by state law, *Jackson*, 443

U.S. at 323 n.16, 99 S.Ct. at 2792 n.16, and the court "gives great weight to the state court's determination." *Gibson*, 947 F.2d at 782, 786; *Porretto v. Stalder*, 834 F.2d 461, 467 (5th Cir. 1987) (Louisiana Supreme Court's review of evidence for sufficiency to prove guilt "entitled to great weight in a federal *habeas* review"). Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction. *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990), citing *Jackson*, 443 U.S. at 319, 324-25, 99 S.Ct. at 2789, 2792; *Pate v. Wainwright*, 607 F.2d 669, 670 (5th Cir. 1979) (*per curiam*). The fact that most of the evidence against a defendant was circumstantial does not change the standard of review. *United States v. Zuniga-Salinas*, 945 F.2d 1302, 1305 (5th Cir. 1991), citing *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989).

Moreover, contrary to Williams' position, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, as those determinations are the exclusive province of the jury. *United States v. Young*, 107 Fed.Appx. 442, 443 (5th Cir. 2004) *citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *Garcia*, 995 F.2d at 561 *citing United States v. Greenwood*, 974 F.2d 1449,1458 (5th Cir. 1992). Thus, all credibility choices and conflicting inferences are to be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) citing *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999). Accordingly, "whether judges doubt the credibility of a witness, even an accomplice witness cooperating with the

government, is beside the point ...." *Greenwood*, 974 F.2d at 1458.

On direct appeal, the Louisiana Third Circuit Court of Appeal found that the evidence was sufficient to support petitioner's convictions. In reaching this conclusion, the court applied the standard set forth by the United States Supreme Court in *Jackson v. Virginia* and expressly found that "the circumstantial evidence in this case was abundant and that by evaluating the evidence in the light most favorable to the state, any rational trier of fact could have found the elements of the crimes involved proven beyond a reasonable doubt. Furthermore, every reasonable hypothesis could have been excluded. Therefore, we find that this assignment of error has no merit." For the reasons set forth below, the state court decision was not contrary to, nor an unreasonable application of, federal law, nor was the decision an unreasonable determination of the facts in light of the state court record. Accordingly, Williams is not entitled to federal *habeas* relief with respect to this claim.

Louisiana law requires the following elements be proved to support a conviction for aggravated burglary: (1) that there was an unauthorized entry of an inhabited dwelling where a person is present, (2) the entry was done with a specific intent to commit a felony or theft therein, and (3) that the offender was armed with a dangerous weapon, or after entering armed himself with a dangerous weapon or committed a battery upon a person while in such place. La. R.S. 14:60; *State v. Lockhart*, 438 So.2d 1089, 1090 (La. 1983); *State v. Pierre*, 733 So.2d 674, 676-677 (La. App. 5th Cir. 1999); *State v. Walker*, 542 So.2d 756, 761 (4th Cir. 1989); *State v. Greenwell*, 746 So.2d 29, 35 (La. App. 2nd Cir.

1999).

Battery is defined as the intentional use of force or violence upon the person of another; simple battery is defined as a battery committed without the consent of the victim. La. R.S. 14:33; La.R.S. 14:35. Battery includes "every touching or laying hold, however trifling, of another person ... in an angry, revengeful, rude, insolent, or hostile manner." *State v. Robinson*, 549 So.2d 1282 (La. App. 3rd Cir. 1989) quoting *State v. Robertson*, 20 So. 296 (La. 1896) and *State v. Foster*, 101 So. 255 (La. 1924). Moreover, the physical contact required need not be injurious; it may simply be offensive. *State v. Mitchell*, 466 So.2d 514 (La. App. 3rd Cir. 1985) citing *State v. Dauzat*, 392 So.2d 393, 396-397 (La. 1980); *State v. Lachney*, 621 So.2d 846, 847-848 (La. App. 5th Cir. 1993). Thus, any "offensive touching" will suffice. *Id.*

To support a conviction for second degree kidnaping, the state must prove the following elements: (1) a forcible seizing and carrying of any person from one place to another, (2) where the victim is physically injured or sexually abused. La. R.S. 14:44.1 (A) (3) and (B) (1); *Greenwell*, 746 So.2d at 35.

The evidence presented at trial, considered in the light most favorable to the State as required by *Jackson*, can be summarized as follows. Eighty-four year old Evelyn Patout testified that on the night of December 27, 1997 sometime after 8:30 p.m., while she was reading a book in her bed, a male entered her bedroom, threw a blanket over her and wrapped his arms around her pinning her arms down. After telling Patout that he

would kill her if she didn't quit moving, Patout stopped struggling. The intruder asked Patout for money, and Patout told the intruder that her purse, which contained her checkbook, was on a chair next to the bed. He then asked for her car keys. Patout advised that the keys were on a mantel in another room. The intruder then made her walk with him to the other room to get the keys. While doing so, the intruder told Patout that they would walk through her bathroom. Patout thought it strange that the intruder knew where her bathroom was. At approximately 9:00 p.m., the intruder placed Patout in the trunk of her vehicle, and although it was "freezing" and a "terribly cold night," the intruder took the blanket from Patout. Patout was then driven around while inside the trunk of her car. She later heard voices of "a few boys" and overheard one say "give me some of that dope." During her time in the trunk, Patout did not try to let people know she was in the trunk because she was scared.

The next morning, after spending the entire night in the trunk of her car, Patout heard traffic and people on the sidewalk. At that time, she felt safe enough to bang on the trunk of the car to try and get help. Perry Comeaux heard Patout's cries for help. He found a black male, later identified as Paul Stanley Collins, who produced the keys. When her rescuers opened the trunk, all testified that they were "shocked" to find Patout. As a result of the incident, Patout sustained physical injuries to her back and arm. Those injuries were depicted in photographs introduced into evidence by the State. Although Patout could not identify Williams as the intruder, she stated that he had done yard work

for her in the past.

On the night of the abduction, Paul Stanley Collins testified that he and his brother were approached by two black males who were driving Patout's vehicle. Collins knew one of the men as "Bank". "Bank" was later identified as Wilton Arthur Vital. The other man, who Collins had never met, identified himself as "Kenny." These men wanted to rent Patout's vehicle to Collins in exchange for drugs. An agreement was reached; Collins and his brother took the vehicle in exchange for drugs, promising to return the vehicle to "Kenny" across the street from a school at 5:00 a.m. in the morning. After riding around in the vehicle during the night, at 5:00 a.m. Collins attempted to return the vehicle at the agreed upon location, but "Kenny" wasn't there. Accordingly, Collins drove the vehicle to his girlfriend's house, went inside and fell asleep. He was awakened the next morning by Comeaux who was looking for the car keys to open the trunk. When he and Comeaux did so, to their surprise, they found Patout. During the time that Collins and his brother drove the car around, he never heard any noise coming from the trunk. The police executed an outstanding misdemeanor warrant on Collins. While he was in custody, Collins told Detective Baudoin the story of the prior night's events. Collins admitted that he had prior felony convictions and that he had not been charged for drug transactions relating to this incident, but that he was in court to tell the truth.

On the morning of December 28, 1997, Alicia Muffoletto was working as a cashier

at the Lydia Food Store.  A black male entered the store and cashed a check from Ms.

Patout's account.  Later that day, Deshia Broussard, another clerk at the store, was asked

by a black male to cash another one of Patout's checks.  Broussard took the check to her

manager, Deborah Strickland, for approval.  Strickland had heard of Ms. Patout's

abduction and called the police.  Detective Baudoin responded and arrested the man who

attempted to cash Patout's second check.  That man, Williams (petitioner here) was later

identified by Broussard as the man who attempted to cash the Patout check.

   While Collins was still in police custody, Collins saw Detective Baudoin bring

Williams into the station.  Collins immediately told Baudoin that Williams was the man

who had identified himself the night before as "Kenny."  Detective Baudoin corroborated

Collins' version of events.

   "Bank" (Vital) also corroborated Collins' testimony.  Vital testified that on the

night of Patout's abduction, he was approached by a black male driving Patout's vehicle

who identified himself as "Kenny."   "Kenny" told Vital that he was interested in renting

the vehicle in exchange for drugs, and asked if he knew anyone who might be interested.

Vital said that he would help to rent the vehicle if he could have some of the drugs

received in the exchange.  After driving around the "back roads", Vital and "Kenny" cut a

deal with the Collins brothers to rent the vehicle for drugs.  After "Kenny" showed

Collins where to return the vehicle, the Collins brothers drove Vital home.  The next day,

Vital heard the police were looking for him.  He voluntarily went to the police station and

told Detective Baudoin his story. Vital was shown a photographic line-up prepared by Baudoin, and he picked Williams as the person who had identified himself as "Kenny." Detective Baudoin corroborated Vital's testimony in that regard. Vital admitted that he had not been charged for any of the drug transactions which occurred that evening, but that at the time he spoke with police and identified Williams, no deals or promises had been made to him by the police.

Detective Landry testified that he found an open bedroom window at the Patout residence. He also discovered a tennis shoe print on the bedroom floor originating at the window and pointing in the direction away from the window, and another print on the dining room floor. At the time of Williams' arrest, Williams was wearing a pair of Nike tennis shoes. These tennis shoes were sent to the Acadiana Criminalistics Laboratory along with the shoe prints found in Patout's residence. Mark Kurowski, an expert in shoe impressions employed by the Lab, testified that the prints found in Patout's bedroom were made by Williams' tennis shoes. Kurowski admitted, however, that before he received Williams' size 13 tennis shoes, he incorrectly estimated that the prints were made by a size 10 to a size 12 shoe. Although fingerprints were recovered from Patout's vehicle, none of those finger prints were conclusively determined to have been made by Williams. Moreover, cigarette butts found in the vehicle were not determined to have been smoked by Williams.

In light of the above, viewing the evidence in a light most favorable to the

prosecution, the evidence presented at trial was more than sufficient to sustain both of petitioner's convictions. The direct and circumstantial evidence at trial concerning Williams' identity as the perpetrator is sufficient, despite the lack of any eyewitness identification of Williams at the scene of the crime. Both Collins and Vital identified Williams as the driver of Patout's car on the night of her abduction, and as the person who rented that vehicle for drugs. Although Williams challenges the veracity of their testimony, it is not the province of this court, on sufficiency of the evidence review, to make credibility determinations. *See Young, Garcia, Greenwood* and *Ramirez*, supra. Moreover, this court cannot find their testimony so incredible or insubstantial that, as a matter of law, it must be discounted. Collin's testimony was corroborated by Detective Baudoin and Vital; Vital's testimony was similarly corroborated by Detective Baudoin and Collins. Additionally, the shoe prints found in Patout's bedroom near the open window matched the tennis shoes Williams was wearing at the time of his arrest. Moreover, Patout testified that Williams had previously done work for her at her home and that the intruder knew the layout of her home. Finally, Williams was identified by Broussard as the person who attempted to cash one of Patout's stolen checks the day after her abduction. Considering the "great weight" afforded to the state court's determination and the above cited evidence, the undersigned finds that "any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." Accordingly, this claim does not warrant *habeas* relief.

## II. Excessive Sentence

Petitioner alleges that his sentences are cruel, unusual and excessive in violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution of 1974. The State argues that petitioner never raised an Eighth Amendment excessive sentence claim in the Louisiana state courts. Therefore, the State contends that the claim is unexhausted, and hence, technically procedurally defaulted. The State's position is well taken. Review of petitioner's filing in the Louisiana Supreme Court reveals that petitioner did not raise his excessive sentence claim under the Eighth Amendment to the United States Constitution. Rather, petitioner expressly raised his claim solely under Article I, § 20 of the Louisiana Constitution of 1974 and L.C.Cr.P. article 894.1. *See* rec. doc. 1, Ex. 1, pg. 2 and 7-8.

Federal *habeas corpus* relief is available only for "violation[s] of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). Therefore, to be entitled to relief, "a 28 U.S.C. §2254 applicant must claim violation of a federal constitutional right." *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998); *See also Deters v. Collins*, 985 F.2d 789, 791 fn. 1 (5th Cir. 1993) citing 28 U.S.C. §2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 480 (1991). It is not the province of a federal *habeas* court to determine if the state courts properly applied state law. *Estelle*, 502 U.S.

at 68, 112 S.Ct. at 480; *Narvaiz*, 134 F.3d at 695. Rather, "[f]ederal *habeas corpus* review is limited to errors of constitutional dimension ...." *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).

The scope of federal *habeas* review is limited by the intertwined doctrines of procedural default and exhaustion. Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, ("traditional" procedural default), or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal *habeas* claim. *Bledsue v. Johnson,* 188 F.3d 250, 254-55 (5th Cir. 1999) citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546 (1986) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728 (1999).

Before seeking a federal writ of *habeas corpus*, a state prisoner must exhaust available state remedies, thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1349 (2004) citing 28 U.S.C. § 2254(b)(1), and *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) *(per curiam)* quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). To provide the State

with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court, including a state supreme court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.* citing *Duncan,* 513 U.S. at 365-366, 115 S.Ct. 887, and *Boerckel,* 526 U.S. at 845. "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief ... by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Howell v. Mississppi,* 543 U.S. 440, 125 S.Ct. 856, 859 (2005) citing *Baldwin,* 541 U.S. at 32. This is necessary to establish that a federal question was properly presented to a state court. *Id.* Moreover, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised. *Bell v. Cone*, 543 U.S. 447, 125 S.Ct. 847, 851 at fn. 3 (2005) citing *Baldwin,* 541 U.S. at 30- 32.

A petitioner has "technically exhausted" his federal claim if he fails to properly and timely present his claim to the Louisiana courts and is time-barred from seeking relief in the Louisiana courts because he has allowed his state court remedies to lapse. *Magouirk v. Phillips,* 144 F.3d 348 (5th Cir.1998) citing *Coleman v. Thompson*, 501 U.S. 722, 731-33, 111 S.Ct. 2546 (1986) and *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995); *Coleman*, 111 S.Ct. 732, 735 fn. 1; *Bledsue,* 188 F.3d at 254-55*; Fuller v. Johnson*, 158 F.3d 903, 905-06 (5th Cir.1998). In such a case, however, there is no difference between non-exhaustion and procedural default. *Magouirk*, 144 F.3d at 358. Accordingly, when a petitioner fails to exhaust state court remedies because he has

allowed his federal claims to lapse, those claims are "technically" procedurally defaulted.
*Id.*

Review of petitioner's filing in the Louisiana Supreme Court reveals that petitioner did not raise his excessive sentencing claim under federal law, or more specifically, under the Eighth Amendment to the United States Constitution. There is no mention or argument of any federal constitutional issue or any federal law supporting such a claim in his filing which could have alerted that court that his claim could arise under federal law. Petitioner did not cite the Eighth Amendment to the United States Constitution, nor any cases directly construing the Constitution or the Eighth Amendment in support of this claim. Rather, this issue was raised in the state courts solely on state law grounds. Petitioner argued that the trial court's failure to consider mitigating circumstances (lack of a lengthy criminal record, drug problems, treatment at a mental health facility and lack of evidence presented at trial) as required by L.C.Cr. P. article 894.1 "shocks one's sense of justice and amount [sic] to the needless imposition of pain and suffering" in violation of Article 1, § 20 of the Louisiana Constitution of 1974. The Louisiana Third Circuit Court of Appeals, the last state court to render a decision on the merits, therefore analyzed this claim under Louisiana standards finding that the trial court did not abuse its discretion when sentencing petitioner to a sentence within the statutory range, and further that the trial court complied with the "codal guidelines" of article 894.1 when imposing petitioner's sentence. *See State v. Williams*, 815 So.2d 916 (La. App. 3rd Cir. 2002). Thus, because petitioner failed to raise any federal constitutional claim in connection with

his excessive sentencing claim, it is clear that any such federal claim is unexhausted.

Under Louisiana Code of Civil Procedure 930.8, the time to present such a federal claim has expired; petitioner is now time-barred from seeking review of a federal claim in the Louisiana courts. Thus, any potential federal claim which petitioner may have had is "technically" procedurally defaulted.

Petitioner fails to argue cause or prejudice to excuse his default or that failure of this court to review his claim would result in a fundamental miscarriage of justice. *See Finley v. Johnson*, 243 F.3d 215, 220-221 (5th Cir.2001); *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546 (1986); *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454 (1991); *Moore v. Roberts,* 83 F.3d 699 (5th Cir. 1996); *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074 (1996); *Sones v. Hargett,* 61 F.3d 410,416 (5th Cir.1995). To the contrary, petitioner argues that because the Louisiana Constitution "was framed after the United States Constitution", affording Louisiana citizens greater rights than those under its federal counterpart, petitioner did need to assert a violation of his Eighth Amendment rights in the Louisiana state courts. The undersigned finds this argument novel, but unavailing. Although federal and state standards may be "somewhat similar", "mere similarity of claims is insufficient to exhaust." *Duncan,* 513 U.S. at 366 citing *Picard v. Connor,* 404 U.S. 270, 276 (1971) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

Moreover, even if petitioner's Eighth Amendment claim was not procedurally

barred, on federal *habeas* review, this court must defer to the state appeals court's decision on the merits unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2); *See also Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166 (2003). Petitioner has made no argument to this effect. Instead, petitioner argues that the state court failed to follow its own sentencing jurisprudence. Allegations of errors of state law are not properly considered in federal *habeas* review. *Narvais v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998); 28 U.S.C. § 2254 (d) (1) and (2). Because petitioner has not demonstrated that the state appeals court's decision was contrary to, or an unreasonable application of, the Supreme Court's Eighth Amendment jurisprudence, and has not demonstrated that the decision was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, under the applicable standard of review, petitioner's claim does not warrant federal *habeas corpus* relief. *Smith v. Cain,* 253 F.3d 700 (5th Cir. 2001) (unpublished).

Finally, petitioner's claim fails on the merits, notwithstanding the applicable standard of review. Generally, the Eighth Amendment protects against not only barbaric punishments, but also those that are grossly disproportionate to the crime committed. *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *Ewing v. California*, 538 U.S. 11, 20-24 (2003); *Lockyer*, 538 U.S. at 72. However, "[for] crimes concededly classified and classifiable as felonies, ... the length of the sentence actually

imposed is purely a matter of legislative prerogative." *Harmelin v. Michigan,* 501 U.S.

957, 962, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) quoting *Rummel v. Estelle,* 445 U.S.

263, 274, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). A federal *habeas* court will not upset a

state sentence within statutory limits unless it is so disproportionate to the offense as to be

completely arbitrary and shocking. *Bonner v. Henderson,* 517 F.2d 135, 136 (5th

Cir.1975). In this way, a "[court] must grant substantial deference to the broad authority

that legislatures necessarily possess in determining the types and limits of punishments

for crimes." *United States v. Gonzales,* 121 F.3d 928, 942 (5th Cir.1997); *see also Ewing*,

538 U.S. at 24-25.

In light of *Solem's* general constitutional principle and other relevant

jurisprudence, the Fifth Circuit set forth its methodology for analyzing excessive sentence

claims in *McGruder v. Puckett,* 954 F.2d 313, 315 (5th Cir.1992). First, the court weighs

the gravity of the offense against the severity of the sentence. *McGruder*, 954 F.2d at

316. Then, if the court determines that the sentence is grossly disproportionate to the

offense, the court compares (2) sentences for similar crimes in the same jurisdiction and

(3) sentences for the same crime in other jurisdictions. Only if the court concludes in the

first inquiry that the sentence is "grossly disproportionate" to the offense, does the court

proceed to determine the second and third inquiries. *United States v. Gonzales*, 121 F.3d

928, 942-943 (5th Cir. 1997). If the court concludes that the sentence is not "grossly

disproportionate," the inquiry is finished, and the court "defer[s] to the will of Congress."

*Gonzales*, 121 F.3d at 942-43.

Here, the issue of whether the sentence is unconstitutionally excessive turns on

whether petitioner's punishment arrives at this threshold level of gross disproportionality.[7]

The Supreme Court noted the inherent subjectivity in making this threshold determination

in *Rummel,* 445 U.S. at 304. Moreover, the Supreme Court has noted that outside the

capitol punishment context, successful proportionality challenges are "exceedingly rare"

and constitutional violations are therefore reserved only for an "extreme" "extraordinary

case." *Ewing*, 538 U.S. at 21; *Lockye*r, 538 U.S. at 73 and 77. In *Rummel,* the Supreme

Court upheld a life sentence under a recidivist statute for a petitioner who had

fraudulently used a credit card, passed a forged check, and finally, obtained $120.75

under false pretenses. Subsequent jurisprudence in this circuit has used *Rummel* as a

benchmark for distinguishing constitutional sentences and grossly disproportionate

punishments. *Gonzales,* 121 F.3d at 943.

Measured against the *Rummel* benchmark, petitioner's thirty year sentence for

aggravated burglary and forty-five year sentence for second degree kidnaping as a second

felony offender under LSA-R.S. 15:529.1(A)(1)(a) is plainly constitutional. First, the

gravity of the offenses committed by petitioner are clearly more severe than the crimes of

fraud and forgery punished by life imprisonment in *Rummel.* Second, unlike the crimes at

---

[7]When imposing petitioner's original sentences, the trial court found that petitioner had been deliberately cruel to his eighty year old victim, who was "particularly vulnerable" and "incapable of resistance due to her advanced age", that petitioner had committed a "heinous act of cruelty" toward his victim, that the crimes were committed with the use of threats and actual violence as demonstrated by the fact that Patout "was violently taken from her home ... thrown in the trunk of her car and left to die overnight in the cold", that petitioner covered Patout so that she would not recognize him and then threw her into the trunk of her car to conceal his commission of the aggravated burglary, that Patout suffered "significant permanent [emotional] injury" and that the crimes had a "serious psychological impact" on her which will remain with her the rest of her life, that drugs were involved in the commission of the crimes, that petitioner refused to accept any responsibility for his crimes despite "overwhelming evidence to the contrary", and that petitioner was on probation for unauthorized use of a moveable at the time he committed these crimes. [tr. pg. 614-617]. During re-sentencing, the court again relied on the reasons outlined during petitioner's original sentencing, and also recognized that petitioner had previously been convicted of possession of cocaine, rendering him a second felony offender. [tr. pg. 645; 652].

issue in *Rummel*, the crimes committed by petitioner against Ms. Patout, an eighty year old defenseless victim, taken from the safety and security of her bedroom, and thrown in the trunk of her car where she was left to die in the cold, were extremely violent, and therefore warrant severe punishment. Finally, the record reveals that petitioner had previously been convicted for possession of cocaine, and that at the time of the instant offenses, was on probation for unauthorized use of a moveable. These convictions demonstrate petitioner's consistent history of recidivism.[8] Accordingly, applying the benchmark test set forth in *Rummel,* the undersigned finds that the facts of this case do not meet threshold level of gross disproportionality; therefore, the sentences are consistent with the constitutional requirements of the Eighth Amendment. *See also McGruder* (upholding a life sentence under a habitual offender statute imposed following conviction for burglary, escape and armed robbery). Thus, petitioner's claim is without merit.[9]

## III. Competency

Petitioner asserts that the trial court erroneously found him competent to stand trial based on the reports of the doctors who examined him. He argues that "obvious mental defect[s]" noted by the examining physicians were disregarded, namely, a non-specific "personality disorder", the possibility that petitioner was subjected to abuse when he was

---

[8]In recidivist cases, a court must consider that "the sentence is [being] imposed to reflect the seriousness of [petitioner's] most recent offense, not as it stands alone, but in the light of his prior offenses." *McGruder,* 954 F.2d at 316; *Ewing,* 538 U.S. at 28-29.

[9]The undersigned also notes that it is clear that the constitutionality of habitual offender statutes is no longer up to serious challenge. *Ewing v. California,* 538 U.S. 11, 25, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), *Parke v. Raley,* 506 U.S. 20, 27, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992). States have a "valid interest in deterring and segregating habitual criminals" *Id.*

younger, and petitioner's tendency to ramble when speaking. Petitioner further asserts

that he suffered a stroke in 1995, and that since his conviction and transfer to state prison,

he has been diagnosed as schizophrenic for which he takes medications. Petitioner

provides no support for these conclusory allegations. Petitioner additionally suggests that

the procedure used to determine his competency was inadequate because the physicians

who examined him were not fair and impartial. This claim is based on petitioner's belief

that the examining physicians' focus was on extracting a confession from him, not on

determining his mental state. Moreover, he complains that they rendered their opinions

on observations made during their examinations of petitioner without conducting tests.

On post-conviction review, both the state trial and appellate courts rejected

Williams' claim on the merits. The trial court found that Williams was competent to

stand trial. This ruling was based on the court's review of the sanity commission reports

of the examining physicians, all of whom found petitioner competent to stand trial, and

the court's own assessment of Williams' behavior in the courtroom during trial. [tr. pg.

916-917]. The appellate court found that the lower court did not abuse its discretion in

finding petitioner "competent to proceed to trial and aid in his defense" and additionally,

that petitioner failed to present proof that he suffered from a stroke or that he was

diagnosed with schizophrenia and that those conditions affected his competency." [tr. pg.

1022].

In this federal *habeas corpus* proceedings, under AEDPA standards, this court

must defer to a state court's merits adjudication of a competency claim. *Colburn v.

Cockrell*, 37 Fed.Appx. 90 (5th Cir. 2002) citing *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th

Cir. 2001). Thus, this federal court may not grant Williams relief unless the state courts' adjudication of Williams' claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that the decision constitutes an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2). Moreover, the state court's determination of facts must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. 2254(e)(1).

Due Process prohibits the conviction of an accused who lacks mental competence to stand trial. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) citing *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 1376 (1996). An accused must have both "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "a rational as well as factual understanding of the proceedings against him." *Id.* at 950 quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (*per curiam*). As a corollary to this substantive right, a state must afford procedures adequate to guard an accused's right not to stand trial or suffer conviction while incompetent. *Holmes v. King*, 709 F.2d 965, 967 (5th Cir. 1983) citing *Drope,* 420 U.S. at 172, 95 S.Ct. at 904 and *Pate*, 383 U.S. at 385, 86 S.Ct. at 842.

Different standards govern the substantive and procedural dimension of the right not to be tried while incompetent. To obtain a federal *habeas corpus* relief on a substantive claim, the accused must offer sufficient "evidence to raise a threshold doubt about competency." *Carter v. Johnson*, 131 F.3d 452, 460 (5th Cir. 1997) quoting *Lokos*

*v. Capps*, 625 F.2d 1258, 1261 (5th Cir.1980).   In order to raise such doubt, he must present facts sufficient to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his mental competency at the time of trial." *Id.* citing *United States v. Williams*, 819 F.2d 605, 609 (5th Cir. 1987); *Goynes v. Dretke,* 139 Fed.Appx. 616, 619 (5th Cir. 2005) citing *Dunn v. Johnson*, 162 F.3d 452, 460 (5th Cir. 1997) and *Carter, supra*.  This threshold burden is "extremely heavy." *Id.* at fn. 11 quoting *Johnson v. Estelle*, 704 F.2d 232, 238 (5th Cir. 1983).  In the absence of such a showing, a *habeas* court has no duty to investigate the constitutional challenge further. *Washington,* 90 F.3d at 950.

To show a procedural violation, the accused must point to evidence before the trial court that raised a *bona fide* doubt about competency at the time of trial.  *Holmes,* 709 F.2d at 967.  The test is an objective one based on what was known to the trial court at the time of trial.  *Mathis v. Dretke,* 124 Fed.Appx. 865875 (5th Cir. 2005 citing *Lokos v. Capps,* 625 F.2d 1258, 1261 (5th Cir. 1980).   Once such a doubt is known by the trial court, it must conduct an adequate inquiry into the defendant's mental capacity.  *Holmes,* 709 F.2d at 967 citing *Pate*, 383 U.S. at 385, 86 S.Ct. at 842.   The fact finding process must rest on procedures and evidence "sufficient to permit a trier of fact reasonably to assess an accused's competency against prevailing medical and legal standards." *Holmes*, 709 F.2d at 967 citing  *Fulford v. Maggio*, 692 F.2d 354, 361 (5th Cir.1982), *rev'd on other grounds*,  462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).   The adequacy of the procedures varies according to the "fact matrix." *Id.* citing  *Curry v. Estelle*, 531 F.2d 766, 768 (5th Cir.1976).   However, the Fifth Circuit has "never

suggested that a state court must conduct 'a full-blown competency hearing every time there is the slimmest evidence of incompetency.'" *Id;* citing *United States v. Horovitz,* 584 F.2d 682, 683 n. 3 (5th Cir.1978). Rather, all that is required is "an inquiry into a defendant's mental capacity ...." *Lokos,* 625 F.2d at 1261 citing *Pate,* 86 S.Ct. 836 (1966).

Given the deferential AEDPA standard of review afforded the state court's determination of petitioner's competency claim and the "extremely heavy" burden of proof necessary to justify federal *habeas corpus* relief on grounds of mental incompetency, to the extent petitioner claims to have been incompetent at his 2001 trial, that claim is without merit. Petitioner has not shown sufficient evidence that at the time of his 2001 trial there was any doubt about his competency to stand trial. Given that the substantial weight of the medical evidence at the time of petitioner's trial established that petitioner was competent and merely feigning mental illness or malingering, and the fact that the trial judge's first-hand observation of petitioner's behavior in the courtroom led the court to the same conclusion, Williams has failed to present facts sufficient to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt" concerning his mental capacity. Thus, in the absence of this threshold showing, this court has no duty to investigate the constitutional challenge further.

The record reflects that prior to trial, the state court held extensive sanity proceedings, all of which resulted in findings of petitioner's competency to stand trial. On Motion by defense counsel[10], a sanity commission, consisting of psychiatrist Dr.

---

[10]The record reveals that two Motions were filed. The first Motion was filed on April 7, 1998 by defense attorney William R. Collins; the second Motion was filed on June 23, 1998 by defense counsel M. Craig Colwart. [tr. pg. 43 and 50]. The sanity commission was appointed by Order of Judge Ann Simon dated July 1, 1998. [tr. pg. 51].

James Blackburn and Dr. James Falterman, was appointed. [tr. pgs. 43, 50 and 51]. A sanity hearing was set for August 6, 1998. However, on that date, Dr. Blackburn had not yet issued his report to the court. Accordingly, on Motion of the State in which defense counsel joined, the hearing was continued. [tr. pg. 53-55; 52].

Dr. Blackburn's report indicates that petitioner "is quite capable of answering a number of questions appropriately, precisely, and without difficulty." Moreover, although he claimed to have trouble "explaining himself", Williams "appear[ed] to be able to do so without any difficulty when the subject matter [was] not threatening to him." Dr. Blackman further noted that Williams "has some knowledge of the legal system", that "he knows that the role of the judge in court" and that of the jury, and that he understood what the term "arraignment" means. Williams was also able to "speculate about the potential penalties someone would face if found guilty of the charges that he is charged with" stating that a guilty verdict could cause somebody "to do real time." Thus, Williams did understand the nature of the offenses against him and their potential consequences if convicted. Additionally, Williams opined that he could assist his attorney in preparing a defense and that it was his belief that with a "good attorney", he could prove he "didn't do it." Although Williams advised that he had been treated in the past for "nerve problems" at Lafayette General Hospital and also at the New Iberia Mental Health Clinic, Dr. Blackburn opined that "other than perhaps a personality character disorder" there was no indication that Williams suffered from any mental illness or deficit that would prevent him from being able to participate in the proceedings, and that "he should be able, if he chooses to do so, stand trial without any difficulty."

Finally, Dr. Blackburn noted that Williams "tends to ramble about inconsequential matters" in an attempt "to make the examiner feel that he has some type of mental problem." However, he believed petitioner was "malingering mental illness", but that he did "not do so very effectively." [tr. pg. 56-58].

Dr. Falterman similarly noted that Williams exhibited "some rambling of speech throughout the interview" and that he was "very evasive"; however, that was interpreted as being "a purposeful maneuver." Dr. Falterman further noted that Williams was "reality oriented" and that his "attempted derealization" was "obviously false." Williams disclosed a prior hospitalization in the Lafayette General Psychiatric Unit in 1987 or 1988, and that he had been treated at the New Iberia Mental Health Unit. Personnel of that Unit advised Dr. Falterman that their evaluation of Williams revealed only that "the possibility of a personality disorder existed." Williams further disclosed that "there was some abuse in his early life", but that Williams was evasive in answering questions on this subject. In sum, it was Dr. Falterman's impression that although Williams was "of low intelligence" he did "not exhibit any characteristics indicative of psychosis or schizophrenia." To the contrary, it was his opinion that Williams' "mental status" was "essentially normal." Dr. Falterman further noted that although "there may be the suggestion of a personality disorder", Williams nevertheless was "felt to be able to relate to his attorney in a rational manner and ... capable in assisting in the planning of his legal strategy ...." Further, Dr. Falterman opined that Williams "understands the significance of the charges against him and the range of possible penalties that he may be facing." Thus, it was Dr. Falterman's professional opinion that Williams could, "in fact, assist his

attorney with his defense and [was] able to stand trial ...." [tr. pg. 110-115].

A defense Motion and Order for Re-examination was granted on May 18, 1999. [tr. pg. 104-108; 10]. By letter dated June 17, 1999, Dr. Falterman reported that he had reviewed letters written by Williams as well as his prior report, and that based on his review he believed further psychological evaluation was needed to better define Williams' mental state. He recommended Dr. Warner, Dr. Friedberg and Dr. Lowe as "extremely competent" examiners. Notably, in his correspondence, Dr. Falterman did not render any new or supplemental opinion regarding Williams' competency to stand trial. [tr. pg. 1436-1437]. Rather than arrange for examination by the recommended professionals, on July 20, 1999, defense counsel filed a Motion to Transport petitioner to the East Feliciana Mental Hospital for in-patient evaluation. That request was granted by Order dated July 21, 1999. [tr. pg. 109]. After numerous delays while awaiting a bed at that facility [tr. pg. 116-118; 121-124; 12], on February 9, 2000, Williams was examined by Dr. Sarah Deland of the Louisiana Department of Health and Hospitals Office of Mental Health Forensic Aftercare Clinic. [tr. pg. 143].

In rendering her March 15, 2000 report, Dr. Deland interviewed petitioner and reviewed the reports of Drs. Falterman and Blackman, letters written by Williams since his incarceration, records from the University Medical Center, the New Iberia Health Clinic and the Iberia Parish Jail, petitioner's confinement order, and his arrest warrant. She additionally attempted to conduct a Geogia Competency Test; however, Williams was "uncooperative" and accordingly, the test could not be administered. [tr. pg. 143; 144-145]. After reviewing this information and evaluating Williams, it was Dr. Deland's

opinion that Williams was "malingering mental illness and does have the ability to understand the proceedings and to assist his attorney, should he choose to do so." [tr. pg. 143].  More specifically, as a result of her evaluation and review of petitioner's records, Dr. Deland found that petitioner "currently has a rational as well as a factual understanding of the proceedings against him ... and has a sufficient present ability to consult with his ... lawyer with a reasonable degree of rational understanding." [tr. pg. 147].  Although noting that Williams had, in the past, been diagnosed at the New Iberia Mental Health Clinic with "personality disorder, NOS", Dr. Deland nevertheless specifically found petitioner competent at the time of her examination.  Noting petitioner's understanding of legal concepts such as arraignment, his right to an attorney and the concept of mistaken identity, Dr. DeLand found "no reason, from a psychiatric perspective, that [Williams] would not be able to understand the charges", and further, noting Williams' "volitional" lack of cooperation and "inconsistent" presentation of his ability to remember, found "no psychiatric reason why [Williams] cannot assist his attorney."

A competency hearing was held on June 23, 2000 before Judge Carl J. Williams. In lieu of live testimony, the matter was submitted on the reports of the examining physicians.  Having reviewed the reports, the court found Williams competent to proceed to trial.  [tr. pg. 15].

Clearly, the trial court fulfilled the Constitutional mandates of the Fourteenth

Amendment. The trial court conducted an extensive inquiry into petitioner's mental capacity ordering a sanity commission, and an additional examination of petitioner thereafter. In all, petitioner was examined by three independent medical professionals, Dr. Blackburn, Dr. Falterman and Dr. DeLand. All three, including the last medical professional to examine petitioner prior to his June 23, 2000 sanity hearing, unequivocally found petitioner competent to stand trial and to assist with his defense and also found petitioner to either be feigning mental illness or malingering. The trial court had the benefit of all of the records when making the competency determination. These records are easily comprehensible as they are written in lay language as opposed to medical jargon. The record reflects that the trial court thoroughly examined the records and on that basis concluded, as did all of the examining medical professionals, that petitioner was competent to stand trial.

Petitioner argues that "obvious mental defect[s]" noted by the examining physicians were disregarded, namely, a non-specific "personality disorder", the possibility that petitioner was subjected to abuse when he was younger, and petitioner's tendency to ramble when speaking. However, contrary to Williams' assertion, the presence of a mental defect does not demonstrate mental incompetence to stand trial. *Goynes v. Dretke*, 139 Fed.Appx. 616, 2005 WL 1712276 at *3 (5th Cir. 2005); *Colburn v. Cockrell,* 37 Fed.Appx. 90, 2002 WL 1021891, *6 (5th Cir. 2002) citing *Mata v. Johnson,* 210 F.3d 324, 329 fn. 2 (5th Cir. 2000) (noting that "the forensic test for competency does not

require that the person be free of psychotic illness or psychiatric problems", that "'the presence or absence of mental illness or brain disorder is not dispositive' of competency" and that "mental illness is not equivalent to incompetency."). *See also Panetti*, 73 Fed.Appx. 78, 2003 WL 21756365 at **3-4 (rejecting an argument that history of mental illness including schizophrenia, tendency to ramble and proclivity for bizarre behavior rendered the petitioner incompetent); *Flugence v. Butler*, 848 F.2d 77, 80 (5th Cir. 1988) (emotional outbursts and bizarre behavior insufficient indicia of incompetence). Moreover, the state courts did consider this evidence. The reports of the examining physicians noted the possibility of a personality disorder, petitioner's rambling speech and alleged abuse, but found that none of these alleged defects rendered petitioner incompetent. Rather, these defects were the primary basis for their findings that petitioner was feigning mental illness. Indeed, these same characteristics, noted by the trial judge in the courtroom during petitioner's 2001 trial, led the court to the same conclusion.

Finally, the record and trial transcript in this case supports the state courts' conclusion that petitioner had a rational understanding of the proceedings and was able to assist in his defense. *See Panetti*, 73 Fed.Appx. 78, 2003 WL 21756365 at *4 citing *Dunn*, 162 F.3d at 305-306 (trial transcript of petitioner's courtroom behavior demonstrated an ability to formulate a trial strategy and supported a finding of competency); *Smith v. Dretke*, 2006 WL 169436, *7 (N.D.Tex. 2006) (trial transcript

revealing that petitioner had the ability to conduct a defense refuted claim of incompetency). During his trial, Williams' asked his counsel to make numerous objections, requested that counsel elicit allegedly favorable testimony and actively participated in his defense; he also filed numerous *pro se* pleadings seeking dismissal of the charges and his release from custody. Accordingly, this argument fails to satisfy Williams' threshold burden that his competency was in doubt at the time of his trial.

Petitioner's further assertion that he suffered a stroke in 1995, and that since his conviction and transfer to state prison, he has been diagnosed as schizophrenic, is equally insufficient. Initially, the undersigned notes, as did the Louisiana Third Circuit Court of Appeals in post-conviction proceedings, that petitioner provides no support for these conclusory allegations. *See Andrews v. Rogers*, 1999 WL 169436, *7 (E.D.La. 1999) (conclusory allegations of nervous breakdown without evidentiary support insufficient). Additionally, anecdotal evidence of psychiatric illness is insufficient to overcome the presumption of correctness that attaches to the state court's determination of competency. *Colburn,* 37 Fed.Appx. 90, 2002 WL 1021891 at *6 citing *Carter*, 131 F.3d at 461. Moreover, as noted by the state appellate court in post-conviction proceedings, none of this information demonstrates that petitioner was incompetent at the time of his trial. The proper inquiry for an incompetency claim is the petitioner's mental state at or near the time of trial. *Goynes*, 139 Fed.Appx. 616, 2005 WL 1712276 at *3; *Colburn,* 37 Fed.Appx. 90, 2002 WL 1021891 at *4-7; *Butler*, 848 F.2d at 80. The state courts'

finding of competency was based on competency evaluations rendered near the time of

petitioner's trial and the state trial judge's first-hand observations of Williams at trial.

The trial judge's assessment is entitled to substantial deference as he was in the best

position to assess the petitioner's competence. *See Butler*, 848 F.2d at 80. Petitioner's

allegations of a stroke six years prior to trial and alleged subsequent diagnosis of

schizophrenia upon his post-conviction arrival at a state institution do not overcome this

strong evidence of competency. Indeed, the Fifth Circuit has expressly rejected the same

argument presented by petitioner herein holding that "subsequent events, specifically, the

diagnosis of paranoid schizophrenia upon ... arrival at Angola ... fall short of our

precedential requirement to 'positively, unequivocally and clearly generate a real,

substantial and legitimate doubt as to ... mental capacity' ... [and] is not sufficient to meet

the burden of proof required for issuance of the Great Writ." *Butler*, 848 F.2d at 80

(citations omitted).

      For these same reasons, to the extent Williams argues a procedural violation, by

contending that the procedure used to determine his competency was inadequate, that

claim is without merit. As set forth above, there was insufficient evidence before the trial

court to raise a *bona fide* doubt about petitioner's competency to stand trial. Moreover,

there was no evidence before the trial court which raised a *bona fide* doubt about the

competence and neutrality of the physicians who examined petitioner. Contrary to

petitioner's self-serving assessment of the examining physicians' focus, their reports

reveal that the physicians properly focused on determining petitioner's competency to stand trial as required by law. Moreover, there is no Constitutional requirement that the physicians' assessment of competency be based on tests, as opposed to observations made during their examinations. To the contrary, like the examinations performed on petitioner, the vast number of competency assessments are based solely on the examiner's observations during the examination and questioning without any testing whatsoever. Finally, it is clear that Dr. DeLand attempted to perform the complained of missing tests on petitioner, but petitioner refused to cooperate in the testing procedure. In sum, under the "fact matrix" of this case, the procedure employed in petitioner's case (the formation of a sanity commission to evaluate petitioner's competency, the grant of an additional re-evaluation of petitioner's competency and a hearing submitting the question of competency on the reports of the examining physicians) and the evidence adduced as a result of those procedures (reports of three qualified medical professionals) was more than "sufficient to permit [the trial court] reasonably to assess [Williams'] competency against prevailing medical and legal standards." *Holmes*, *supra*. Considering the evidence known to the trial court, it is clear that Williams received an "adequate inquiry" into his mental capacity to stand trial. *Holmes* and *Lokos, supra.*

Based on the foregoing, petitioner has failed to satisfy his burden of proof necessary to justify federal *habeas corpus* relief on grounds of mental incompetency. Petitioner has failed to make the required threshold showing of facts sufficient to

"positively, unequivocally and clearly generate a real, substantial and legitimate doubt" concerning his mental capacity at the time of trial to justify relief on a substantive competency claim, and has failed to present sufficient evidence known to the trial court which raises a "*bona fide* doubt" about petitioner's competency at the time of his 2001 trial to justify relief on a procedural competency claim.

Finally, in light of the above, petitioner has failed to demonstrate that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or that the decision constitutes an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Holmes,* 709 F.2d at 968 citing *Fulford*, 462 U.S. at ----, 103 S.Ct. at 2264 (quoting 28 U.S.C. §2254(d) (1976)) (pre-AEDPA, emphasizing that federal *habeas* courts should accept the state court's evaluation of competency unless that evaluation is not "fairly supported by the record." Here, there is ample support for the trial court's reasons).

For the reasons set forth above, petitioner's competency claims should be dismissed with prejudice.

## IV.  Speedy Trial

Petitioner contends that his Sixth Amendment right to a speedy trial was violated by the 37 month delay between his arrest and trial. To properly analyze this claim, a chronology of relevant pre-trial events is necessary.

Williams was arrested for forgery on December 28, 1997. [tr. pg. 31-32]. A Bill of Information charging petitioner with aggravated burglary, second degree kidnaping and forgery was filed on March 20, 1998. [tr. pg. 33].

On March 23, 1998, defense counsel Glenda Huddleston filed a Motion for Discovery. [tr. pg. 35-38]. Following the grant of that Motion, the State complied with the discovery request on April 7, 1998, providing defense counsel with a copy of the District Attorney's file in petitioner's case. [tr. pg. 41-42].

On March 23, 1998, defense counsel also asserted petitioner's statutory right to a speedy trial, certifying that the defense would be ready to proceed to trial within the statutory delays set by La.C.Cr.P. art. 701(d)(1)(a)[11]; that request was granted by Order dated March 24, 1998. [tr. pg. 39-40]. However, on April 7, 1998, defense attorney William R. Collins filed a motion to have petitioner evaluated by a sanity commission; a duplicate second Motion was filed thereafter on June 23, 1998 by defense counsel M. Craig Colwart. [tr. pg. 43 and 50]. A sanity commission, consisting of psychiatrist Dr. James Blackburn and Dr. James Falterman, was appointed by Order of Judge Ann Simon dated July 1, 1998. [rec. pg. 51]. A sanity hearing was set for August 6, 1998.

---

[11]Article 701 requires the defense to file a motion for speedy trial asserting the defendant's demand for the trial to be commenced within the delays set forth in the article. L.C.Cr.P. art. 701(D)(1). After the filing of such a Motion, if a felony trial is not commenced against an incarcerated defendant within one hundred twenty days, the article provides for the release of the defendant without bail obligations, pending trial, unless the State demonstrates "just cause" for the delay. L.C.Cr.P. art. 701(D)(1)(a) and (2). It does not provide for dismissal of the indictment, nor does it provide an affirmative defense to a state criminal prosecution based upon alleged violations of the defendant's right to speedy trial. That defense and corresponding remedy is obtained via the filing of a Motion to Quash after the expiration of the time for commencement of trial following institution of the prosecution, which in non-capitol felony cases, is two years. *See* L.C.Cr.P. arts. 578(2); 532(7); 581; *State v. Rome*, 630 So.2d 1284, 1286 (La. 1994)..

However, on that date, Dr. Blackburn had not yet issued his report to the court.

Accordingly, on Motion of the State in which defense counsel joined, the hearing was

continued. [tr. pg. 51; 53-55; 52]. The reports of both Drs. Blackburn dated August 31,

1998 and Falterman dated July 16, 1998, finding petitioner competent to stand trial, were

received by the court. [tr. pg. 110-115; 56-58]. No ruling on petitioner's competency

appears in the record following submission of those reports. However, petitioner's trial

was set for December 7, 1998. [tr. pg. 4]. Thus, it appears that petitioner's competence

was no longer at issue following the submission of those reports.

On December 7, 1998, the State moved to continue the trial, without objection

from the defense. The trial was continued until April 12, 1999. [tr. pg. 4]. The basis for

the continuance was because the State was waiting for results of DNA analysis on

physical evidence recovered from the crime scene. The reason that the case was not reset

for the January 1999 docket was because the court re-allotted pending cases during that

time frame and the newly assigned judicial officer's next trial date was April 12, 1999.

[tr. pg. 75-77].

On December 10, 1998, defense counsel William R. Collins filed a "Motion for

Release under La.C.Cr.P. Art. 701", requesting that Williams be released from

incarceration without bail pending trial, on grounds that petitioner remained incarcerated,

the time limitations set forth in article 701 for commencement of trial had expired, and

petitioner's felony trial had not yet commenced. [tr. pg. 61]. A show cause hearing was

originally set for February 23, 1999, but subsequently reset by the court for January 26, 1999. [tr. pg. 62; 73]. During the hearing, the State explained that the case had been delayed because of the appointment of a sanity commission, the complexity of the case necessitating DNA testing, and the court's re-allotment of cases at the beginning of the new year. The State assured the court that case would be ready for trial on April 12, 1999. The court denied petitioner's motion for "701" release, finding "good cause" shown for the delay. [tr. pg. 74-78; 5]. During the hearing there was no mention of, or argument on, petitioner's Sixth Amendment right to a speedy trial, nor was there any argument that case should be moved to an earlier trial date or dismissed on Sixth Amendment grounds. Rather, the motion and argument focused on obtaining petitioner's release from custody pending trial, and did not attempt to obtain a speedier trial date or dismissal on Sixth Amendment grounds.

By pleadings dated February 10, 1999, Williams filed a *pro se* Motion for Disclosure of Rule 404(b) Evidence [tr. pg. 79-81], a *pro se* Motion for Bill of Particulars [tr. pg. 82-85], and a *pro se* Motion for Discovery of *Brady* evidence [tr. pg. 86-88]. There are no rulings on these Motions contained in the record, perhaps because defense counsel was previously provided with a copy of the District Attorney's file in response to a prior counseled discovery motion.

On February 12, 1999, the State filed Notice of its intention to introduce inculpatory statements made by the defendant, and a corresponding a Motion to Determine the Admissibility of same. This Motion was set for hearing on February 23,

1999. [tr. pg. 89-91]. The State indicated that it was prepared to go forward with the Motion hearing. However, Ms. Huddleston for the Indigent Defender Board, who was standing in for defense counsel Collins, moved for a continuance of the hearing. Over the State's objection on grounds that Williams was incarcerated and had already filed "701 Motions", the court continued the hearing until March 1, 1999. [tr. pg. 92-95]. On March 1, 1999, the hearing on the Motion was conducted; no evidence or testimony was presented, however, because defense counsel stipulated that the statements were voluntarily made. [tr. pg. 96-99].

On March 2, 1999, both parties indicated that they were prepared to go to trial on April 12, 1999. The transcript indicates that there was some off the record discussion about the defense filing an additional motion. However, defense counsel advised that he had not determined if that would be done. [tr. pg. 101-103]. In light of the subsequent case history, it appears that Collins was referring to a motion to have Williams' competency re-evaluated.

On April 12, 1999, the court minutes indicate that defense counsel, William R. Collins, erroneously identified as "the Assistant District Attorney", moved for a continuance of the trial. Accordingly, the trial was re-set for July 12, 1999. [tr. pg. 9].

Thereafter, on May 18, 1999, a hearing on a defense Motion to Re-Evaluate Williams' competency was conducted. At that hearing, defense counsel Collins requested that Williams be re-evaluated by Dr. Falterman as soon as possible, considering the

rapidly approaching July 12, 1999 trial date. The court granted the defense Motion for Re-Evaluation, assigning the task of making arrangements for the examination to the defense and additionally requiring the defense to submit an Order memorializing the court's ruling. [tr. pg. 104-107; 10]. That Order was submitted and signed on May 25, 1999. [tr. pg. 108].

By letter dated June 17, 1999, Dr. Falterman reported that he had reviewed letters written by Williams as well as his prior report, and that based on his review he believed further psychological evaluation was needed to better define Williams' mental state. Dr. Falterman recommended Dr. Warner, Dr. Friedberg and Dr. Lowe as "extremely competent" examiners. [tr. pg. 1436-1437]. Rather than arrange for examination by these professionals, on July 20, 1999, defense counsel filed a Motion to Transport petitioner to the East Feliciana Mental Hospital for in-patient evaluation. That request was granted by Order dated July 21, 1999. [tr. pg. 109].

The court convened on October 11, 1999 and again on November 22, 1999. On those dates, the State informed the court that Williams had not yet been transported from the parish jail to the East Feliciana Mental Hospital because that facility did not have a bed available for Williams. [tr. pg. 116-118; 121-124; 11; 12]. Accordingly, after suggesting that Williams be referred "to some other site that can take him", the court requested that the District Attorney contact East Feliciana to determine why they could not admit Williams, and then set a telephone conference between counsel and the court

for November 23, 1999. [tr. pg. 123]. There record contains no information as to what transpired during the November 23, 1999 telephone conference.

On February 9, 2000, Williams was examined by Dr. Sarah Deland of the Louisiana Department of Health and Hospitals Office of Mental Health Forensic Aftercare Clinic. [tr. pg. 143]. By report dated March 15, 2000, Dr. Deland, like Drs. Blackburn and Falterman, found petitioner competent to stand trial. [tr. pg. 143-148].

By *pro se* pleading dated March 8, 2000, Williams filed a "Motion for Release Under L.A.C,Cr.P. Art. 701" in which he again asked the court "to release him from jail without bail obligation ..." because the time limitations set forth in article 701 had expired. Petitioner additionally complains that he was not transported to court for proceedings and accordingly suggests that his rights were violated because during these times "things been sign [sic] and said without my consent." He also complained that Iberia Parish Jail officials had not provided him adequate medical care for his "spinal cord and nervous system" and medication for tuberculosis. [tr. pg. 1453-1454]. A hearing on the Motion was held for April 11, 2000. Petitioner's Motion for Release was denied, and petitioner's trial was reset for July 10, 2000. [tr. pg. 13]. No transcript of the hearing appears in the record.

On June 19, 2000, a pre-trial conference was set; however, the pre-trial conference was continued until June 23, 2000. The July 10, 2000 trial date was maintained. [tr. pg. 14-15].

On June 23, 2000, Judge Carl J. Williams found petitioner competent to proceed to trial. [tr. pg. 15].

On July 10, 2000, the court's minutes indicate that twenty-six cases set for trial on that date, one of which was petitioner's case, were continued and re-fixed for trial on October 9, 2000, on motion of Assistant District Attorney Lori Landry, not Mr. Bofill Duhe, the prosecutor in petitioner's case. No reason for the continuance was stated other than a notation indicating "full cycle". [tr. pg. 1349-1350].

A pre-trial conference was held on September 8, 2000 and the State indicated that it was ready to proceed to trial on October 9, 2000. However, on October 3, 2000 Williams filed a *pro se* Motion to Remove his court appointed counsel, William R. Collins. [tr. pg. 155-157]. As a result, on October 6, 2000, Collins filed a Motion to Withdraw as Counsel of Record for Williams and a Motion to Continue the October 9, 2000 trial date citing Williams' refusal to cooperate with counsel as the basis for the Motion. [tr. pg. 163-164]. Both defense Motions were granted on October 9, 2000, and accordingly, petitioner's trial was reset for January 8, 2001. [tr. pg. 163-164; 18].

On December 1, 2000, Williams filed another *pro se* "Motion to be Released Under Article 701." In that pleading, Williams again asserted that the time limitations set forth in article 701 for commencement of his prosecution had expired and that the State could not show that the delay was based on "just cause." Therefore, Williams again requested his release without bond obligations. [tr. pg. 1456]. That Motion was heard and

denied on January 5, 2001. [tr. pg. 21]. No transcript of the hearing appears in the record.

Williams' jury was selected on January 10, 2001 and his trial before Judge John E. Conery began January 12, 2001. [tr. pg. 23-24; 25-28]. At trial, petitioner was represented by M. Craig Colwart of the Indigent Defender Board.

The Sixth Amendment guarantees a defendant in a criminal case the right to a speedy trial. U.S. Const. amend. VI; *Barker v. Wingo,* 407 U.S. 514, 519-22 (1972). Under *Barker,* a court must consider four factors in assessing a speedy-trial claim: (1) the length of the delay, (2) the reason for the delay, (3) when the defendant asserted the right, and (4) prejudice to the defendant resulting from the delay. *Barker,* 407 U.S. at 530. The "triggering mechanism" for the inquiry is the length of the delay. *Id.* If the delay between the date of arrest or indictment and the date of trial is presumptively prejudicial, the court must make specific findings regarding the other three factors. *Robinson v. Whitley,* 2 F.3d 562, 568 (5 Cir.1993), *cert. denied,* 510 U.S. 1167 (1994).

Williams raised his speedy-trial claim in his state post-conviction application. The state appellate court addressed the claim on the merits expressly finding "substantial delays" were caused by the defense, namely, the filing of a motion to have Williams evaluated by a sanity commission, a motion to have Williams re-evaluated and a motion by petitioner's counsel to withdraw. Thus, "[c]onsidering all the circumstances in this case", the appellate court found that Williams' "constitutional right to a speedy trial was

not violated." *State v. Williams*, KH 04-00396 (La. App. 3rd Cir. 7-8-04) [tr. pg. 1022].

The first *Barker* inquiry, the length of the delay, is a "threshold inquiry"; unless the delay may be deemed "presumptively prejudicial", inquiry into the remaining *Barker* factors is not warranted. *Knox v. Johnson*, 224 F.3d 470, (5th Cir. 2000); *Cowart v. Hargett,* 16 F.3d 642, 646 (5th Cir. 1994). However, the length of delay is merely presumptive and does not warrant an immediate conclusion that the defendant has been denied his Sixth Amendment right to a speedy trial. *Robinson,* 2 F.3d at 568. Rather, the defendant's conduct must be weighed against that of the government (state) under the remaining three *Barker* factors. *Id.* Neither *Barker* nor the Constitution define when a delay becomes "presumptively prejudicial." However, the Fifth Circuit has held that a delay of one year is "presumptively prejudicial", and therefore, is sufficient to trigger analysis of the remaining *Barker* factors. *Robinson,* 2 F.3d at 568; *United States v. Wood*, 248 F.3d 1143 (5th Cir. 2001) citing *United States v. Lucien*, 61 F.3d 366, 371 (5th Cir. 1995). Because the delay in Williams' case exceeds one year[12], the delay is deemed presumptively prejudicial, and the remaining three *Barker* factors must be examined and balanced to determine if the Sixth Amendment was violated. *Robinson,* 2 F.3d at 568.

---

[12]Petitioner contends that the delay in his case should be calculated from December 28, 1997, the date of his arrest on forgery charges, which charges were later dropped, rather than March 20,1998, the date on which the State filed a Bill of Information charging him with the crimes for which he was subsequently convicted. There is an argument that the delay should be calculated from March 20, 1998. *See Cowart*, 16 F.3d at 645-646. However, using either date, the delay in petitioner's case exceeded one year. Accordingly, there is no need for further discussion as to the legally proper date from which the delay should be calculated.

With respect to the second *Barker* factor, the reason for the delay, as noted by the state appellate court, the reason for the delay appears to be substantially attributable to the defense. The Supreme Court has noted, "pretrial delay is often both inevitable and wholly justifiable." *Wood, supra*. quoting *Doggett v. United States*, 505 U.S. 647, 656 (1992). Thus, "where the state advances valid reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in favor of the state." *Cowart*, 16 F.3d at 647 citing *Barker*, 407 U.S. at 531; *Wood, supra*. Moreover, A deliberate and intentional delay by the prosecution for the purpose of hindering the defense or otherwise gaining a tactical advantage is weighed heavily against the state; whereas unexplained or negligent delay is weighed less heavily. *Cowart,* 16 F.3d at 647; Robinson, 2 F.3d at 569 citing *Barker,* 407 U.S. at 531.

In light of the above chronology, it is clear that Williams was responsible for most of the delay by virtue of the April 1998 defense request for a sanity commission to evaluate petitioner's competency (causing nearly a five month delay), the defense's April 1999 request for a continuance of the trial, May 1999 request for re-evaluation of petitioner's competency and subsequent July 1999 request for in-patient evaluation (causing a delay of one year and two and one-half months) and the defendant's request for the removal of counsel and the contemporaneous request for continuance just days prior to the scheduled October 2000 trial date (causing an additional three month delay). Thus, Williams should properly bear responsibility for the "lion's share" of the delay. *See*

*Robinson*, 2 F.3d at 569; *See also United States v. Neal*, 27 F.3d 1035, 1043 (5th Cir.

1994) (weighing delay occasioned by defense motions for competency examinations and

requests for continuances against the defendant); *McCoy v. Cabana*, 794 F.2d 177, 180 at

fn.1 (5th Cir. 1986) (refusing to weigh the time the defendant's competency was being

evaluated pursuant to a defense motion against the state); *United States v. Abou-Kassem*,

78 F.3d 161 (5th Cir. 1996) (finding no Sixth Amendment violation with respect to

sentencing due to the defendant's filing a motion to determine his mental condition post-

conviction); L.C.Cr.P. art. 579(2) (excluding times during which the defendant cannot be

tried due to "insanity" and due to "any other cause beyond the control of the state" from

the two year limitation for commencement of non-capitol felony trials set froth in article

578 (2)).

Moreover, there is no evidence that any of the delay properly attributable to the

State was a deliberate attempt by the State to hamper the defense or to gain any tactical

advantage. To the contrary, the State's request for a continuance in December 1998 to

complete DNA testing was "justified" by a "valid reason" given the importance of the

evidence in establishing Williams' guilt or innocence, the complexity of this case, and

lack of any evidence that the State was dilatory in the preparation of its case or more

specifically, in attempting to obtain DNA testing. *See Morehouse v. McLaughlin*, 1999

WL 813905, *5 (D.N.H. 1999) (finding a continuance by the state for the purpose of

completing forensic blood testing and DNA matching was justified and accordingly, not

charged against the state); *United States v. Nazarenus*, 983 F.2d 1480, 1483-1484 (8th Cir. 1993) (finding no Sixth Amendment violation occasioned by delay resulting from government continuances obtained to enable forensic and DNA testing to be performed); *See also United States v. Williams*, 2006 WL 1476021, *1 (W.D.La. 2006) citing *United States v. Drapeau*, 978 F.2d 1072 *th Cir. 1992) (noting that any delay resulting from a continuance while government requested DNA testing is performed would be excluded from the "speedy trial calculation" under the federal Speedy Trial Act pursuant to the "ends of justice" provision). Thus, the delay occasioned as a result of that continuance is weighed in favor of the State. *Cowart,* 16 F.3d at 647.

Moreover, following that request for a continuance, the court calendar would not permit the trial to be reset until April 1999, despite the fact that the State was prepared to go to trial as early as March 2, 1999. Finally, although the court minutes reflect that the State moved for continuance in July 2000, considering the State's March 2, 1999 declaration of readiness for trial, that the request was made along with similar requests in numerous other cases by a prosecutor not assigned to this case, and the notation in the court minutes indicating "full cycle", it appears that continuance may not be solely attributable to the State. *See Fisher v. Hargett*, 997 F.2d 1095, 1101 (5th Cir. 1993) (recognizing that delay due to the trial court's interests may be weighed less heavily). Thus, to the extent that any such delay may properly be attributable to the State, it should be weighed less heavily than a deliberate delay. *Cowart,* 16 F.3d at 647 citing *Barker,*

407 U.S. at 531. Accordingly, the undersigned finds that on the balance, the reason for the delay, the second *Barker* factor, weighs against Williams.

With respect to the third *Barker* factor, petitioner's assertion of his right to a speedy trial, the state court record reveals that on March 23, 2003, three days after the filing of petitioner's Bill of Information, Williams' first court appointed counsel, Glenda Huddleston, filed a Motion for Speedy trial, asserting petitioner's statutory right to a speedy trial, and certifying that the defense would be ready to proceed to trial within the statutory delays set by La.C.Cr.P. art. 701(d)(1)(a). However, less than two weeks after that certification, newly appointed defense counsel, William R. Collins, filed a motion to have petitioner evaluated by a sanity commission, thus delaying the proceedings. Indeed, under Louisiana law, upon the filing of that motion, all proceedings were stayed while petitioner's competency was determined. *See* La.C.Cr.P. arts. 642. The state court record additionally reveals that a total of three Motions for Release pursuant to La.C.Cr.P. article 701 were filed by the defense, all of which request petitioner's release without bail or bond obligations. None of those motions request an earlier trial date, and none of those motions specifically allege a Sixth Amendment violation. The first such Motion was filed by counsel three days after the State obtained an uncontested continuance of the trial pending DNA test results. At that point, a substantial portion of the delay was attributable to petitioner's request for a sanity evaluation, which as noted above stayed the prosecution. *See* L.C.Cr.P. art. 642. The next available trial date was in April because of

the court's re-allotment of cases at the beginning of the new year.  The second *pro se*

Motion was filed on March 8, 2000, while a ruling on the defense's request for re-

evaluation of petitioner's competency to stand trial was still pending.  Hence, the filing

was made while the case was stayed pending that determination.  *See* L.C.Cr.P. art. 642.

The third and final Motion was filed on December 1, 2000, after the trial had been

continued until January, 2001 on defense motion as a result of petitioner's request to have

his attorney Mr. Collins "removed" and Collins' request for withdrawal due to Williams'

failure to cooperate with him.

Under *Barker*, the assertion of the speedy trial right is entitled to "strong

evidentiary weight."  *Robinson*, 2 F.3d at 569.  However, the point at which the defendant

asserts his right is important because it may be indicative of the degree of seriousness

with which the defendant asserts his right.  *Id*.  Thus, just because a defendant "pepper[s]

the court with speedy trial motions does not mean that he [does] so out of an honest desire

for a speedy trial."  *Id*. at 570.  Here, petitioner's Motions for Release were filed during

times when the delay occasioned by the State was justified, when the case was stayed

pending competency evaluations and when the delay was attributable to petitioner.  Thus,

while petitioner did assert his speedy trial right, the timing of petitioner's Motions for

Release suggest they may not have been filed out of an honest desire to obtain a speedy

trial.  Accordingly, although this factor weighs in Williams' favor, it does not do so heavily.

The fourth *Barker* factor involves an inquiry into the degree of prejudice suffered

by the defendant due to delay in prosecution. Any prejudice to Williams must be assessed in light of his interest (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern of the accused, and (3) to limit the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532. Because Williams is responsible for the "lion's share" of the delay, Williams must demonstrate "concrete proof of his prejudice ...." *Robinson*, 2 F.3d at 570; *See also Cowart,* 16 F.3d at 647 (requiring "an affirmative showing of actual prejudice"); *United States v. Crosby,* 713 F.2d 1066, 1078-79 (5 Cir.) (requiring proof of actual, substantial prejudice), *cert. denied,* 464 U.S. 1001 (1983). The most important consideration in the prejudice factor is whether Williams' defense was impaired by the delay. *Barker,* 407 U.S. at 532.

Williams asserts that he unduly suffered from the delay. However, anxiety during pre-trial delay is insufficient to warrant reversal of a conviction. *Cowart,* 16 F.3d at 647. Williams argues that his defense was impaired because due to the length of delay, "the opportunity for discovery of exculpatory evidence was lost." Williams' assertions are unsupported by any proof in the record and, are thus conclusory. As such, Williams has not shown that his defense was prejudiced. *Robinson*, 2 F.3d at 571 (unsupported, general assertions that evidence and alibi witness testimony was lost due to delay insufficient to demonstrate prejudice to the defense); *Meyer v. Cockrell,* 2003 WL 21507584, *5 (N.D.Tex. 2003) citing *Anderson v. Collins,* 18 F.3d 1208, 1221 (5 Cir.1994); *Collins v. Cockrell*, 2002 WL 31415986, *5 (N.D.Tex. 2002); *Wanzer v.*

*Cockrell*, 2002 WL 31045971, *6 (N.D.Tex. 2002). Moreover, to the extent that petitioner is referring to a loss of testimony from alleged alibi witnesses, those allegations fail to demonstrate prejudice to the defense. Williams' alibi witnesses, petitioner's mother, Florida Williams, and his former girlfriend, Barbara Broussard, were present at trial to testify, and in fact did testify out of the presence of the jury. However, neither witnesses' testimony provided an alibi defense for Williams. Ms. Patout was abducted from her home when it was dark outside at approximately 8:30 to 9:00 p.m. at night. [tr. pg. 368, 381]. Petitioner's mother testified that she last saw Williams when it was still daylight; Broussard similarly testified that Williams left her "close to dark" but that it "wasn't quite dark yet" and returned after she had gone to bed between 12:00 and 12:30 a.m. while she was sleeping. [tr. pg. 540-541]. Thus, petitioner cannot demonstrate prejudice on these grounds. *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000) (declining to find prejudice where the alleged alibi witness could not have supplied an alibi defense because the testimony of other witnesses disproved the defense); *Robinson*, 2 F.3d at 571 (no prejudice where alleged alibi testimony would have been "destroyed" by the defendant's own statements and the testimony of other witnesses); *Cowart*, 16 F.3d at 648 (declining to find actual prejudice resulting from the alleged inability to call an alibi witness). This factor therefore weighs in favor of the state.

In light of the above, the *Barker* factors, on balance, show that Williams was not denied his federal constitutional right to a speedy trial. The state appellate court's

decision was therefore a reasonable determination of the facts in light of the evidence presented in the state court proceeding. Further, the findings did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law. Accordingly, federal *habeas* relief with respect to petitioner's speedy trial claim is not warranted.

## V. Law of Battery

Petitioner contends that the court and prosecutor misstated the law of battery during *voir dire* and in opening and closing arguments, thus lowering the burden of proof required to convict petitioner of aggravated burglary.[13] The complained of language includes comments that battery includes situations when "you actually put your hands on the other person without their permission", and "when someone who does go into someone's house [and] puts their hands on that person without their permission", and "unconsensual [sic] touching, however slight."

The Louisiana Third Circuit Court of Appeal found petitioner's claim "without merit" citing *State v. Robertson*, 20 So. 296 (La. 1896), *State v. Foster*, 101 So. 255 (La. 1924), *State v. Dauzat*, 392 So.2d 393, 396-397 (La. 1980), *State v. Robinson*, 549 So.2d 1282 (La. App. 3rd Cir. 1989), *State v. Mitchell*, 466 So.2d 514 (La. App. 3rd Cir. 1985) and *State v. Lachney*, 621 So.2d 846, 847-848 (La. App. 5th Cir. 1993).

---

[13]As set forth above, to support a conviction for aggravated burglary, Louisiana law requires that the perpetrator commit a battery on a person inside an inhabited dwelling. La. R.S. 14:60; *State v. Lockhart*, 438 So.2d 1089, 1090 (La. 1983); *State v. Pierre*, 733 So.2d 674, 676-677 (La. App. 5th Cir. 1999); *State v. Walker*, 542 So.2d 756, 761 (4th Cir. 1989); *State v. Greenwell*, 746 So.2d 29, 35 (La. App. 2nd Cir. 1999).

Under the applicable standard of review, there is no error in the Louisiana Third Circuit's disposition of petitioner's claim requiring this court's intervention. As set forth above, battery, defined as the intentional use of force or violence upon the person of another, and simple battery, defined as a battery committed without the consent of the victim, includes "every touching or laying hold, however trifling, of another person" and also includes "offensive touching". La. R.S. 14:33; La.R.S. 14:35; *State v. Robinson*, 549 So.2d 1282 (La. App. 3rd Cir. 1989) quoting *State v. Robertson*, 20 So. 296 (La. 1896) and *State v. Foster*, 101 So. 255 (La. 1924); *State v. Mitchell*, 466 So.2d 514 (La. App. 3rd Cir. 1985) citing *State v. Dauzat*, 392 So.2d 393, 396-397 (La. 1980); and *State v. Lachney*, 621 So.2d 846, 847-848 (La. App. 5th Cir. 1993). Therefore, it was not error for the court or prosecutor to argue, imply or instruct that petitioner could be found guilty of aggravated burglary on a finding that petitioner had, however slightly, offensively touched or laid hands on Ms. Patout without her consent. The complained of statements were correct under the Louisiana statutory definition of battery and the Louisiana jurisprudence interpreting those definitions. Accordingly, because these statements conveyed a correct statement of the applicable state law, they did not lower the burden of proof required for petitioner's aggravated burglary conviction. Petitioner's claim is without merit.

## VI. Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must establish

that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984). The burden is on the petitioner to show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. The court's scrutiny is "highly deferential" and the court must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689-90. See also *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985).

*Strickland's* prejudice element requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[14] A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) citing *Strickland,* 104 S.Ct. at 2068. However, self serving conclusory statements

---

[14]The *Strickland* court outlined the extent of prejudice that must be established by the defendant:
> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of the criminal proceeding if the error had no effect on the judgment. *Cf. United States .v Morrison,* 449 U.S. 361, 364-65 (1981).

> Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability exists if the probability is sufficient to undermine confidence in the outcome.

> When a defendant challenges a conviction , the question is whether there is reasonable probability that absent the errors the fact-finder would have a reasonable doubt respecting guilt.

*Strickland, supra*, at pages 691-692.

that the outcome would have been different "fall far short of satisfying *Strickland's* prejudice element." *Id.*

Because both *Strickland* factors, that of deficient performance and prejudice, must be satisfied, "an ineffective assistance contention may be rejected on an insufficient showing of prejudice, without inquiry into the adequacy of counsel's performance." *Strickland,* 466 U.S. at 689-94. Petitioner must satisfy both prongs of *Strickland,* demonstrating both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999); *Green v. Johnson,* 160 F.3d 1029, 1035-36 (5th Cir. 1998). However, "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green,* 160 F.3d at 1043.

Williams contends that he was denied the effective assistance of counsel because (1) Glenda Huddleston of the Indigent Defender Board appeared for petitioner's appointed counsel of that same Board, Mr. Collins, at a February 23, 1999 hearing on the state's motion to determine the admissibility of inculpatory statements made by petitioner and asked for a continuance because she lacked knowledge of the case; (2) because he was represented by different members of the Indigent Defenders Board; (3) that Mr. Colwart advised prospective jurors during *voir dire* of a conflict between he and Williams; (4) that Mr. Collins and Mr. Colwart failed to properly investigate petitioner's case; and (5) that Mr. Colwart presented no mitigation evidence during his original

January 19, 2001 sentencing.

In post-conviction proceedings, the state appellate court found that petitioner had "failed to meet the burden of proof set out in *Strickland v. Washington* ...." For the reasons set forth below, that determination is not contrary to, nor is it an unreasonable application of federal law, nor is that determination an unreasonable determination of the facts in light of the state court record. *Habeas* relief is therefore, not warranted with respect to these ineffective assistance of counsel claims.

**Huddleston's Request for a Continuance on February 23, 1999**

As set forth above, Ms. Huddleston of the Indigent Defender Board stood in for defense counsel Collins at a February 23, 1999 hearing on the State's Motion to Determine the Admissibility of Inculpatory Statements made by Williams. Because she was unfamiliar with petitioner's case, Huddleston moved for a continuance of the hearing. The continuance was granted and the hearing was subsequently held on March 1, 1999 with Mr. Collins in attendance. [tr. pg. 92-95; 96-99]. Under these circumstances, petitioner has failed to demonstrate that Huddleston's actions prejudiced the defense. Accordingly, this claim is without merit.

**Representation by Different Members of the Indigent Defenders' Board**

For these same reasons petitioner's claim that he received ineffective assistance of counsel as a result of his having been represented by various members of the Indigent

Defenders' Board lacks merit. Petitioner has failed to demonstrate that he suffered any prejudice as a result of having been represented by different attorneys in the course of his criminal prosecution. More specifically, Williams has failed to show a reasonable probability that, but for counsels' unprofessional errors, the result of his proceeding would have been different, or a reasonable probability sufficient to undermine confidence in the outcome of his trial. *Sayre, supra*. Williams' self serving conclusory statements to the contrary "fall far short of satisfying *Strickland*'s prejudice element." *Id.* Petitioner's claim is therefore without merit.

**Colwart's Statement to Prospective Jurors during *Voir Dire***

During *voir dire*, defense counsel Colwart advised the potential jurors that they may see conflict between he and Williams during trial, and accordingly asked the jurors if they would be able to "put that aside and not let that influence [them]" instead, deciding the case on the evidence presented at trial, to which all responded that they could. [tr. pg. 317-319]. Williams contends that in making this statement, Colwart advised potential jurors of the "serious conflict" existing between he and Colwart and other members of the Indigent Defenders' Board, resulting in the denial of his right to effective assistance of counsel. The State counters that this statement was a strategic act of an experienced trial attorney who, in anticipation of erratic behavior by Williams, sought to "soften the blow" such behavior may have on the jury. The undersigned agrees.

The record clearly demonstrates that in making the complained of statement,

Colwart was not attempting to prejudice the defense. Rather, Colwart was attempting to uncover and eliminate from service any potential jurors who could not judge petitioner's case solely on the evidence presented, rather than on the basis of events which may occur between counsel and his client. This questioning during voir dire also served to alert the prospective jurors that outbursts might occur, thus "softening the blow" of any such outburst. Given the number of outbursts which occurred during petitioner's trial, the undersigned cannot find that the pre-emptive action taken by defense counsel was anything but reasonable, and was in fact the considered act of an experienced litigator. Clearly defense counsel's actions did not fall outside the wide range of reasonable professional assistance. *Strickland*, *supra*. Moreover, under the circumstances, the undersigned finds that counsel's action was not "so ill chosen that [it] permeated the entire trial with obvious unfairness." *Cotton v. Cockrell,* 343 F.3d 746, 752 (5th Cir. 2003); *See also Livingston v. Johnson*, 107 F.3d 297, 306-307 (5th Cir. 1997). Counsel's performance was therefore not deficient.

**Failure to Investigate Petitioner's Case**

Petitioner contends that both Mr. Collins and Mr. Colwart failed to adequately investigate his case. Williams argues that had they properly investigated his case, defense counsel would have been able to present an alibi defense "or may have been able to assist with his defense in other ways."

With respect to petitioner's alleged alibi defense, as noted above, both of

Williams' alibi witnesses, petitioner's mother, Florida Williams, and his former girlfriend, Barbara Broussard, were present at trial to testify, and in fact did testify out of the presence of the jury. However, neither witnesses' testimony provided an alibi for Williams. Accordingly, Williams cannot demonstrate prejudice as a result of counsels' alleged failure to investigate this defense; even with further investigation, the result of petitioner's alibi defense at trial would have been unaffected. Moreover, the record in this case clearly establishes that counsel did in fact investigate petitioner's alibi defense and determined that defense was not viable. Given the proffered testimony of both witnesses supporting counsel's evaluation of the alibi defense and the deference afforded counsel's judgment, the undersigned finds counsel's performance was not objectively unreasonable.

Petitioner's general allegation that further investigation may have allowed his defense counsel "to assist with his defense in other ways" fares no better. A defendant who alleges a failure to investigate on the part of his counsel must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such evidence would have altered the outcome of the trial. *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) citing *Gray v. Lucas*, 677 F.2d 1086 (5th Cir.1982), *United States v. Lewis*, 786 F.2d 1278 (5th Cir.1986), and *Alexander v. McCotter*, 775 F.2d 595 (5th Cir.1985). Williams has not shown what further investigation would have revealed

and how it would have helped him.  Nor, in light of the above discussion, does Williams

demonstrate that a different outcome would have resulted if counsel had investigated his

case further.  Thus, petitioner is entitled to no relief with respect to this claim.

**Failure to present Mitigation Evidence at Sentencing**

Williams alleges that Mr. Colwart was ineffective because he failed to present

mitigating evidence at his original January 19, 2001 sentencing hearing.  Rather,

petitioner alleges that Colwart "protected his own interests" by "load[ing]" the record to

rebut future ineffective assistance claims.  Petitioner provides no mitigating evidence to

this court which could have been presented by counsel, nor did he do so in the state court.

To the contrary, at the original sentencing hearing, although petitioner was given the

opportunity to testify or speak on his behalf in mitigation of his sentence, he chose not to

testify or ask for leniency.   Rather, petitioner took the opportunity to challenge the jury's

finding of guilt.  Under these circumstances, counsel cannot be faulted for failing to

present non-existing mitigating evidence. [tr. pg. 601-603].  Moreover, given that the

State had already announced its intention to file a multiple offender bill against Williams,

it is understandable that counsel would forego presentation of mitigation evidence, if any

such evidence existed, at the original sentencing hearing, opting instead to present such

evidence at the multiple offender proceeding. [tr. pg. 597-598; 619-620].  For these

reasons, Williams has failed to demonstrate his counsel was deficient at sentencing, or

that any such deficiency caused him any prejudice.

## VII.  Habitual Offender Proceeding/Procedural Default

_____In his final claim for relief, Williams alleges that he was unconstitutionally

adjudicated an habitual offender because the state offered insufficient evidence of his

prior possession of cocaine conviction.  The State argues that this claim is subject the

dismissal because petitioner's claim is procedurally barred.  The undersigned agrees.[15]

The procedural default doctrine applies to bar federal _habeas corpus_ review when

a state court declines to address a prisoner's federal claims because the prisoner failed to

follow a state procedural rule.  _Coleman v. Thompson_, 501 U.S. 722, 750, 111 S.Ct. 2546,

2565, 115 L.Ed.2d 640 (1991).  The last reasoned state court decision on this claim was

---

[15]The State argues the claim is procedurally barred due to the trial court's reliance on L.C.Cr.P. art. 930.4(A).  However, the appellate court found the claim barred under the procedural rule announced in  _State ex. rel. Melinie v. State_,  665 So.2d 1172 (La. 1/12/96).  Because this is the last state court ruling on the claim, the undersigned has analyzed the procedural default doctrine under _Melinie_.  To the extent that it may be argued that State waived the _Melinie_ argument by failing to brief its assertion of the procedural default doctrine under this rule, the undersigned finds it appropriate for this court to raise the _Melinie_ rule _sua sponte_.  Federal courts may, in the exercise of its discretion, raise a _habeas_ petitioner's procural default _sua sponte_ and then apply that default as a bar to further litigation of the petitioner's claim.  _United States v. Willis_, 273 F.3d 592, 596 (5th Cir. 2001) citing _Magouirk_, 144 F.3d at 358, and _Smith v. Johnson_, 216 F.3d 521, 523-524 (5th Cir. 2000). When considering whether the doctrine should be applied, courts are to consider whether the petitioner has been given notice that procedural default will be an issue for consideration, whether the petitioner has had a reasonable opportunity to argue against application of the bar, and whether the State intentionally waived the defense.  _Id._ at 597.  Here, the State did not intentionally waive the procedural default defense with respect to petitioner's habitual offender sentencing claim.  To the contrary, the defense was raised, but briefed with respect to the bar contained in on L.C.Cr.P. art. 930.4(A).  Moreover, given the number of claims raised by petitioner, and the number of claims the State argues are barred under the procedural default doctrine, it appears that the State inadvertently failed to raise the _Melinie_ argument with respect to this claim.  Additionally, petitioner has been placed on notice that the procedural default doctrine would be an issue for consideration by this court by virtue of the State's assertion of the affirmative defense, and has been given an opportunity to respond to that defense by Reply; he chose not to do so.  Moreover, the instant Report and Recommendation provides Williams ample notice of the applicability of the _Melinie_ rule, and by objection hereto, Williams is afforded a reasonable opportunity to argue against application of that rule. _See Willis, Magouirk, supra._ Accordingly, the undersigned finds that _sua sponte_ application of the _Melinie_ bar is proper in this case.

issued by the Louisiana Third Circuit Court of Appeal. That court expressly relied on a

state procedural rule in declining to reach the merits of petitioner's multiple offender

claim. The court cited *State ex rel. Melinie v. State*, 93-1380 (La. 1/12/96), 665 So.2d

1172, *reconsideration denied*, 667 So.2d 1043 (La.1996) as the basis for its decision. In

*Melinie*, the Louisiana Supreme Court held that a prisoner may not challenge a sentence

imposed during habitual offender proceeding in an application for post conviction relief

because that is not an exclusive ground for relief enumerated under Article 930.3.[16]

Rather, such claims must be brought in direct appeal.[17]

     Federal courts typically refuse to reach the merits of questions of federal law if the

state courts have expressly relied on an "adequate and independent" state procedural

ground in refusing to review the claim. In such circumstances, the federal courts may

look beyond the procedural default only if the *habeas corpus* petitioner shows cause for

the default and actual prejudice, or if he shows that the failure to reach the merits of the

claim will result in a complete miscarriage of justice. *Coleman v. Thompson*, 501 U.S.

722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct.

---

[16] LSA C.Cr.P. art 930.3 provides:
"If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted only on the following grounds: (1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana; (2) The court exceeded its jurisdiction; (3) The conviction or sentence subjected him to double jeopardy; (4) The limitations of the institution of prosecution had expired; (5) The statute creating the offense for which he was convicted and sentenced is unconstitutional; or (6) The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana."

[17] In *Melinie*, the Louisiana Supreme Court cited *State v. Gibbs*, 620 So. 2d 296 (La. App. 3d Cir. 1993), wherein the court succinctly differentiated between matters that may be brought in an application for post conviction relief and those that may not, expressly stating that "[t]he legislature has provided a means for review of sentences, whether excessive or illegal, by appeal. See La. C. Cr. P. Art. 881.1 through Art. 912."

2497, 53 L.Ed.2d 594 (1977); *Duncan v. Cain*, 278 F.3d 537, 541 (5th Cir.2002), *cert.*

*denied*, 537 U.S. 829, 123 S.Ct. 127, 154 L.Ed.2d 43 (2002).

Procedural rules are "adequate" when they are "strictly or regularly" applied to the

"vast majority of similar claims.". *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997), *cert.*

*denied*, 523 U.S. 1125, 118 S.Ct. 1811, 140 L.Ed.2d 949 (1998) citing *Amos v. Scott*, 61

F.3d 333, 338 (5th Cir.1995), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d

458 (1995). A procedural rule is "independent" when the last state court rendering a

judgment in the case "clearly and expressly" indicates that its judgment rests on the

procedural ground. *Amos*, 61 F.3d at 338.

The procedural rule identified in this case satisfies both requirements. Review of

Louisiana jurisprudence establishes that Louisiana courts regularly invoke the *Melinie*

decision to bar review of sentencing claims based on multiple offender proceedings raised

in post-conviction applications. *See State ex rel Brown v. State*, 870 So.2d 976 (La.

2004); *State ex rel Brazley v. State*, 2006 WL 1097828 (La. 3/24/06); *State v. Shepard,*

917 So.2d 1086 (La. 2005)*; State v. Hebreard,* 708 So.2d 1291, 1292-1293 (La. App. 4th

Cir. 1998); *State ex rel State v. Williams*, 2006 WL 1097841 (La. 3/24/06); *State ex rel*

*State v. Pierce*, 2006 WL 1049975 (La. 3/17/06); *State ex rel State v. Pollock*, 924 So.2d

177 (La. 2/10/06); *State ex rel State v. Cowart*, 924 So.2d 159 (La. 2/10/06). Moreover,

the Fifth Circuit, this court and the Eastern District of Louisiana have indicated that

*Melinie* is an adequate and independent bar to federal *habeas* review of multiple offender

sentencing claims. *Hull v. Stalder*, 234 F.3d 706 (5th Cir. 2000) (unpublished); *Rhymes v. Warden*, 2005 WL 2123691 (W.D.La. 2005); *Tran v. Cain,* 2006 WL 1627812 (W.D.La. 2006); *Williams v. Miller*, 2006 WL 2087867 (E.D.La. 2006); *Green v. State*, 1998 WL 259970 (E.D. La.), *Scott v. Cain*, 1998 WL 273116 (E.D. La.). Hence, the undersigned finds that the *Melinie* rule constitutes an "adequate" procedural rule to bar federal *habeas corpus* review of petitioner's claim. Moreover, because the last reasoned judgment on the claim, that of the Third Circuit Court of Appeals, specifically referred to the *Melinie* decision when it declined review of the merits of petitioner's sentencing claim, the undersigned finds that the identified procedural rule is also "independent." [18]

When the procedural rule has been shown to be both adequate and independent, the *habeas* petitioner must then show cause and prejudice or that a complete miscarriage of justice will occur if the merits of the claim are not considered. *Sykes*, 433 U.S. at 87-88. According to the Supreme Court, "cause" means that "some objective factor external to the defense" prevented the petitioner from complying with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed. 397 (1986). Petitioner has not established cause for his default nor prejudice.[19] Accordingly, petitioner's default cannot be excused.

---

[18] The Louisiana Supreme Court did not articulate reasons for its denial of writs. However, where there has been a reasoned state court judgment which explicitly rejects the federal claim on state procedural grounds, subsequent unexplained judgments upholding the previous judgment or rejecting the claim are presumed to rely upon the same ground. In other words, when the last reasoned decision on the claim explicitly relied upon a state procedural default, federal courts must presume that later decisions rejecting the claim "did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

[19]*See* fn. 16, *supra*.

Moreover, petitioner has not established that a "fundamental miscarriage of justice" would occur if the federal courts refuse to consider his multiple offender sentencing claim. A "fundamental miscarriage of justice" exists where "the constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649; *Glover,* 128 F.3d at 904; *Ward v. Cain,* 53 F.3d 106,108 (5th Cir. 1995); *Callins v. Johnson,* 89 F.3d 210, 213 (5th Cir.1996) quoting *McClesky v. Zant,* 499 U.S. 467, 495,114 S.Ct. 1454, 1471, 113 L.Ed.2d 517 (1993). The "miscarriage of justice" exception requires the petitioner to make a "colorable showing of factual innocence." *Callins,* 89 F.3d at 213 *quoting McClesky v. Zant*, 499 U.S. 467, 495, 114 S.Ct. 1454, 1471, 113 L.Ed.2d 517 (1993). Petitioner has not made this showing, thus, he has failed to demonstrate that the procedural default doctrine is not applicable herein.

For the above reasons, it is recommended that petitioner's claim directed at his sentencing as an habitual offender should be denied and dismissed with prejudice because his claim is barred by the doctrine of procedural default. Petitioner is therefore not entitled to relief on this claim.

Moreover, even if petitioner's claim may be addressed on the merits, *habea*s relief is not warranted. Under Louisiana law, in multiple offender proceedings, identity of the person convicted of a previous offense may be proved in a variety of ways, including by testimony of witnesses and by evidence of identical driver's licence number, sex, race and

date of birth. *Dedmon v. Cain*, 2005 WL 1578086, *5 (E.D.La. 2005) citing *State v. Henry*, 709 So.2d 322, 325 (La. App. 4th Cir. 1998), and *State v. Neville*, 695 So.2d 534 (La. App. 4th Cir. 1997). Here, William's parole officer for his prior offense identified petitioner in open court as the person he supervised for three years while on probation, and additionally testified as to Williams' physical and personal characteristics, including that Williams was a black male, six feet tall, born on October 4, 1967, and issued social security number 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. [tr. pg. 637-639]. Under these circumstances, there was more than sufficient evidence of petitioner's identity as the perpetrator of the prior offense. Although the State did not enter a transcript of petitioner's prior plea colloquy, it did enter the bill of information, first appearance report, affidavit for petitioner's arrest warrant, confinement order and the court's minutes of petitioner's prior plea hearing, thus establishing the existence of petitioner's prior guilty plea. [tr. pg. 623-629]. Moreover, the court's minutes reflect that Williams was represented by counsel, that prior to entering his plea Williams was advised of his constitutional rights to trial by jury, to confront his accusers and to not incriminate himself, that Williams knowingly and intelligently waived those rights, and that William's plea was freely and voluntarily entered. [tr. pg. 627; 636]. Williams offered nothing to rebut that evidence, and more specifically, petitioner offered no affirmative evidence showing any infringement of his rights or any procedural irregularity in the prior plea proceeding. Accordingly, under Louisiana law, the State met its burden of establishing that petitioner's prior conviction was voluntarily, knowingly

and intelligently entered.  *See State v. Richardson*, 896 So.2d 257, 267 (La. App. 2nd Cir.

2005) citing *State v. Shelton*, 621 So.2d 769 (La. 1993); *State v. Stokes*, 759 So.2d 980,

986-987 (La. App. 5th Cir. 2000); *State v. Jordan*, 732 So.2d 569, 575 (La.App. 5th Cir.

1999).  Accordingly, even if the claim is not procedurally barred, the claim nevertheless

fails on the merits.

For the reasons set forth above;

**IT IS RECOMMENDED** that this petition for *habeas corpus* should be **DENIED**

**AND DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties

aggrieved by this recommendation have ten (10) business days from service of this report

and recommendation to file specific, written objections with the Clerk of Court. A  party

may respond to another party's objections within ten (10) days after being served with a

copy of any objections or response to the District judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the**

**proposed legal conclusions reflected in this Report and Recommendation within ten**

**(10) days following the date of its service, or within the time frame authorized by**

**Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual**

**findings or the legal conclusions accepted by the District Court, except upon**

**grounds of plain error.  *See, Douglass v. United Services Automobile Association*, 79**

F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** in Chambers at Lafayette, Louisiana, September

15, 2006.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE